**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **JANICE L. HUBBELL**,         ) | |
|         ) | |
|     **Plaintiff,**        ) | |
|         ) | |
|   **v.**         ) | **Civil Action No. 06-1686** |
|         ) | **Judge Joy Flowers Conti** |
| **WORLD KITCHEN, LLC, WORLD**   ) | |
| **KITCHEN, INC., UNITED STEEL**   ) | |
| **WORKERS OF AMERICA,**   ) | |
| **AFL-CIO-CLC-LOCAL 53 (A.K.A. THE** ) | |
| **UNITED STEEL, PAPER AND**   ) | |
| **FORESTRY, RUBBER,**   ) | |
| **MANUFACTURING, ENERGY,**   ) | |
| **ALLIED INDUSTRIAL AND SERVICE** ) | |
| **WORKERS INTERNATIONAL**   ) | |
| **UNION), and UNITED**   ) | |
| **STEELWORKERS OF AMERICA D-10** ) | |
| **(INTERNATIONAL),**   ) | |
|         ) | |
|     **Defendants.**      ) | |

## MEMORANDUM OPINION

### I.  *Introduction*

      This case involves discrimination and retaliation claims brought by an employee, plaintiff

Janice L. Hubbell ("Hubbell"), who alleges that both her employer and her union discriminated

against her because of her race, sex and age.  Pending before the court are motions for summary

judgment separately filed by the employer, defendant World Kitchen, LLC ("World Kitchen"),

and the union, defendants United Steelworkers of America, AFL-CIO-CLC-Local 53 ("USW

Local 53") and United Steelworkers of America District 10 ("USW D-10," and together with

USW Local 53, the "USW entities").  For the reasons that follow, those motions will be partially

granted and partially denied.

## II.    *Background*

World Kitchen manufactures and markets bakeware, dinnerware, kitchen tools, household tools, rangetop cookware and cutlery.  (Combined Concise Statement of Undisputed Material Facts of World Kitchen's Mot. for Summ. J. (Doc. No. 82) ("World Kitchen's facts") ¶ 1.) Hubbell is a Caucasian female who was born on October 15, 1962.  (Combined Concise Statement of Undisputed Material Facts for USW entities' Mot. for Summ. J. (Doc. No. 81) ("USW entities' facts") ¶ 1.)  Hubbell was hired by World Kitchen on June 26, 2000.  (*Id.*)  She works as a selector and back-up quality control inspector at a World Kitchen plant located in Charleroi, Pennsylvania.  (World Kitchen's facts ¶ 2.)  As a selector, Hubbell reviews completed kitchen and cooking products before they are packaged for shipment to distributors.  (*Id.* ¶ 3.) She is responsible for ensuring that the products meet production specifications.  (*Id.*)

Since the inception of her employment, Hubbell has been a member of a bargaining unit represented by USW Local 53.  (*Id.* ¶ 4.)  During the period of time relevant to this case, the relationship between World Kitchen and USW Local 53 was governed by several collective bargaining agreements.  (*Id.*)  USW D-10 is a part of United Steelworkers of America International ("USW International").  (USW entities' facts ¶ 2.)  Under the collective bargaining agreement, USW Local 53 has the right to grieve violations thereunder through step four of the contractual grievance procedures, while USW International handles grievances that progress to steps five and six.  (*Id.* ¶ 3.)

Glassware is produced at the Charleroi plant.  (*Id.* ¶ 5.)  Hubbell worked in the finishing department, where products are evaluated by selectors as they travel down a conveyor belt.  (*Id.*)

2

Products that meet World Kitchen's standards are removed from the conveyor belt and packaged for distribution. (*Id.*) Products that do not meet these standards are recycled. (*Id.*) Quality control inspectors randomly examine products to ensure that they are in conformity with the applicable standards and specifications. (*Id.*)

The Charleroi plant is typically staffed by four different crews, three of which are working at a given time. (*Id.* ¶ 6.) Employees rotate between three different shifts. (*Id.*) Like her colleagues, Hubbell rotated between these shifts. (*Id.*) Throughout the course of her employment at World Kitchen, Hubbell was supervised by Kevin Lisovich ("Lisovich"), a Caucasian male, Rory Gazsdick ("Gazsdick"), a Caucasian male, Robert Crabb ("Crabb"), a Caucasian male, and Denise Cavallucci ("Cavallucci"), a Caucasian female. (*Id.*)

In 2003, Marie Bright ("M. Bright"), Leslie Bright ("L. Bright"), Debbie Reynolds ("Reynolds") and Annette Davis ("Davis"), all of whom are African-American females, told Human Resources Manager Donald Good ("Good"), a Caucasian male, and Finishing Supervisor Deimetra Moore ("Moore"), an African-American female, that Hubbell made several race-based comments about the quality of their work. (World Kitchen's facts ¶ 9.) Paula Rechichar ("Rechichar"), a Caucasian female, also accused Hubbell of harassment. (*Id.* ¶ 10.) Hubbell responded by claiming that she had been harassed by M. Bright, L. Bright and Reynolds, who had apparently voiced complaints about her to USW officials. (*Id.* ¶ 11.) Good investigated the conflicting complaints pursuant to a World Kitchen policy requiring allegations of harassment to be evaluated. (*Id.* ¶¶ 12-13.) He concluded that Hubbell had not been harassed on account of her race. (*Id.* ¶ 13.) On December 4, 2003, Hubbell was verbally warned not to harass her fellow employees. (*Id.* ¶ 14.)

3

Crabb was Hubbell's supervisor for most of her tenure as a World Kitchen employee. (*Id.* ¶ 16.) When he worked the shift beginning at 7:00 a.m. and concluding at 3:00 p.m., he was responsible for supervising four glass-production lines and off-line packing in the automatics and finishing departments. (*Id.*) When he worked either of the other two shifts, he was responsible for supervising the entire Charleroi plant. (*Id.*) Crabb, who was born on May 1, 1964, is a little more than eighteen months younger than Hubbell. (*Id.* ¶ 17.)

At some point during the first half of 2004, Crabb allegedly yelled at Hubbell and Joe Rostcheck ("Rostcheck"), a Caucasian male, during a line stoppage. (*Id.* ¶ 18.) Crabb apparently did this because he believed that Hubbell and Rostcheck failed to clean properly the area surrounding the line. (*Id.*) Subsequent to this encounter, Hubbell complained to Good about Crabb's behavior, claiming that Crabb's conduct constituted harassment based on sex and age. (*Id.* ¶ 19.) Crabb yelled at Hubbell in the plant cafeteria, complaining about her work as a back-up quality control inspector and insisting that the products produced during her shift be held for review. (*Id.* ¶ 20.) Shortly thereafter, Crabb was temporarily moved off Hubbell's shift. (*Id.*)

Hubbell experienced tensions with other World Kitchen employees. In 2004, Terry Fonner ("Fonner"), a Caucasian male, threw away products that Hubbell had pulled for quality control checks. (*Id.* ¶ 22.) Gazsdick frequently disagreed with Hubbell's assessment concerning whether products were defective. (*Id.* ¶ 23.) Connie Jones ("Jones"), a Caucasian female, once told Good that Hubbell was wearing sandals in the plant and laying in the women's restroom during work hours. (*Id.* ¶ 24.)

On June 29, 2004, Hubbell suffered a wrist injury while performing work-related tasks. (*Id.* ¶ 6.) A doctor who examined her the following day, however, concluded that her wrist was

4

normal.  (*Id.*)  AIG Claim Services, World Kitchen's worker's compensation carrier, denied

Hubbell's claim for workers' compensation.  (*Id.*)

World Kitchen's Charleroi plant maintains the Charleroi Plant General Factory Rules (the

"Plant Rules"), which contain rules for progressive levels of discipline based upon the severity or

risk of injury to employees, the extent of resulting damage to World Kitchen property, or the

potential degree of loss of production stemming from a particular violation.  (*Id.* ¶ 25.)

Employees who commit level 4 violations of the Plant Rules are subject to immediate

termination.  (*Id.* ¶ 26.)  Both "willful hindering or limiting of production" and "harassment of

any kind" are classified as level 4 violations.  (*Id.*)  The Plant Rules define the term "harassment"

as "conduct that denigrates or shows hostility or aversion towards an individual because of his or

her protected status . . . ."  (*Id.*)

On July 16, 2004, Hubbell was terminated for the stated reason that she committed

violations of the Plant Rules.  (*Id.* ¶ 27.)  The reasons were set forth in her termination letter,

which was authored by Good, as follows:

> This letter is to inform you that you are being terminated for violation
> of the following Plant Rule: <u>Level 4</u>, # 5.  Willful hindering or
> limiting production will not be permitted.  In addition your violation
> of the Harassment Policy is additional grounds for termination.
>
> Several incidents on or about July 10 and July 14, 2004 occurred
> where you did not follow procedures [sic] caused false quality
> readings.   In addition, you [sic] inability to follow recognized
> procedures was costly to the operation when you did not require a
> PDC to continue to pack ware when you determined a ware problem.
> You did not communicate the continued issues with the glass and the
> ware was packed for shipment.  Due to this lack of following
> procedures, bad ware was packed and had to be pulled after it was
> ticketed and ready for shipment.

The harassment incidents occurred on or about July 10 and July 14, 2004 relating to harassment of employees at the Charleroi Facility. You were warned on December 4, 2003 that further harassment would not be tolerated after a lengthy investigation of an incident of harassment.  There have been several incidents of not following QC procedures when placing a production line into a dump mode.

You are being terminated effective, Friday, July 16, 2004.

(App. in Supp. of USW entities' Mot. for Summ. J. (Doc. No. 59), Ex. G6.)  Under Pennsylvania law, an employee who is discharged for "willful misconduct" is ineligible for unemployment compensation benefits.  43 PA. CONS. STAT. § 802(e).  Nevertheless, Hubbell applied for unemployment compensation benefits because she disputed World Kitchen's allegations of misconduct.  (World Kitchen's facts ¶ 27.)

On July 19, 2004, Greg Gladys ("Gladys"), the president of USW Local 53, filed a grievance in connection with Hubbell's termination.  (USW entities' facts ¶ 9.)  A step three grievance meeting was conducted on August 2, 2004.  (*Id.*)  Gladys attended the meeting.  (*Id.*) Meanwhile, on August 23, 2004, Pennsylvania's Department of Labor and Industry determined that Hubbell was eligible for unemployment compensation benefits.  (Pl.'s App. in Supp. of Resps. To Defs.' Concise Statement of Undisputed Material Facts in Supp. of Defs.' Mots. For Summ. J. (Doc. No. 66) ("Pl.'s App."), Ex. 10 at JH275.)  This award of benefits resulted from a determination that World Kitchen failed to provide sufficient evidence of Hubbell's misconduct to sustain its burden of proof.  (*Id.*)  A step four grievance meeting was held on August 24, 2004. (USW entities' facts ¶ 9.)  Gladys was present for the meeting.  (*Id.*)

The matter continued through step five of the grievance process.  In September 2004, USW International staff representative James Watt ("Watt") demanded information from World

Kitchen concerning Hubbell's termination and attended a step five grievance meeting.  (*Id.* ¶ 10.)
Watt and World Kitchen ultimately negotiated a settlement agreement providing for Hubbell's
reinstatement "without loss of seniority" and "without loss of wages."  (*Id.*)  The settlement
agreement also included a basis for calculating the overtime pay that Hubbell lost as a result of
her termination.  (*Id.*)  It was executed by Hubbell, USW Local 53 and World Kitchen on
November 17, 2004.  (*Id.*)  On November 22, 2004, World Kitchen reinstated Hubbell and
provided her with a check in the amount of $11,494.24.  (*Id.*)

Subsequent to her reinstatement, Hubbell decided to pursue further remedies available
under federal and state law.  On November 29, 2004, she filed a complaint with the Pennsylvania
Human Relations Commission ("PHRC") pursuant to 43 PA. CONS. STAT. § 959(a), alleging that
her discharge violated the Pennsylvania Human Relations Act ("PHRA"), 43 PA. CONS. STAT. §
951 *et seq.*  (App. in Supp. of USW entities' Mot. for Summ. J., Ex. G13.)  The complaint was
dual-filed with the Equal Employment Opportunity Commission ("EEOC") in accordance with
42 U.S.C. § 2000e-5(b).  (*Id.*)  Hubbell filed charges against World Kitchen and the USW
entities with the National Labor Relations Board ("NLRB") pursuant to 29 U.S.C. § 160(b),
alleging violations of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 151 *et seq.*
(USW entities' facts ¶ 11.)

Hubbell told Watt that she was owed more money for the overtime that she would have
worked between the date of her termination and the date of her reinstatement.  (*Id.* ¶ 12.)  Watt
conferred with Good, who reminded him that World Kitchen did not reduce Hubbell's back pay
by either her interim earnings or her unemployment compensation payments.  (*Id.*)  Because he
did not believe that arbitration would produce a more favorable result for Hubbell, Watt opted

not to question the terms of the settlement agreement.  (*Id.*)  On March 25, 2005, World Kitchen

sent the PHRC a letter offering to increase Hubbell's gross back pay from $11,494.24 to

$12,203.83.  (*Id.* ¶ 13.)  Hubbell accepted this offer on April 12, 2005.  (*Id.*)

In August 2005, Crabb decided that Hubbell needed to be separated from April Sethman

("Sethman"), a fellow employee.  (*Id.* ¶ 14.)  Hubbell continued to perform the same daily tasks,

and her pay was not reduced as a result of this decision.  (*Id.*)  She spoke with Charlie Danca

("Danca"), a USW Local 53 official, about the matter, requesting that he initiate the grievance

process.  (*Id.*)  Although Danca obtained a copy of a memorandum authored by Crabb in

connection with the decision, he ultimately took no further action.  (*Id.*)

In September 2005, Hubbell gave Barry Clark ("Clark"), a union representative, an

unsigned, handwritten letter protesting the manner in which USW Local 53 had handled matters

related to a seniority issue.  (App. to World Kitchen's Resp. to Pl.'s Additional Factual

Statements (Doc. No. 79), Ex. A-2.)  In the letter, Hubbell referred to some unspecified World

Kitchen employees as "lazy, incompetent" "substance abusers" who needed paychecks "to

support their habits."  (*Id.*)  She stated that these employees were reluctant to ask for a better

contract or to otherwise alienate World Kitchen, because they would be unable to get jobs with

other employers.  (*Id.*)  She referred to her experience as a World Kitchen employee as an

"abusive marriage."  (*Id.*)  Hubbell declared that while some complaints were ignored by USW

Local 53, complaints lodged by four black women were promptly addressed.  (*Id.*)  Hubbell

claimed that she had to "put up with their laz[i]ness, pett[i]ness, and harassment because of their

threats to call the NAACP."[1]  (*Id.*)  She expressed frustration with the failure of the EEOC, the NLRB and the PHRC to end what she described as five years of harassment.  (*Id.*)  Hubbell gave three copies of the letter to Clark, informing him that the two extra copies were for Gladys and World Kitchen's management.  (USW entities' facts ¶ 19.)  After Good refused to accept an unsigned letter, Clark asked Hubbell to sign the copy which had been prepared for World Kitchen's management.  (*Id.*)  Hubbell signed the letter in response to Clark's request.  (*Id.*)

Copies of the letter began to circulate throughout the Charleroi plant.  Someone posted a copy of the letter on a bulletin board located on the production floor.  (World Kitchen's facts ¶ 32.)  Several employees were offended by the contents of the letter.  Reynolds, Rechichar, M. Bright, L. Bright and Jo Ann Smith ("Smith") submitted written complaints to Good concerning Hubbell's behavior in general and her letter in particular.  (App. to World Kitchen's Resp. to Pl.'s Additional Factual Statements, Ex. C-2.)  World Kitchen officials met with Hubbell and Gladys on September 1, 2005, and on October 18, 2005, to discuss the contents of the letter. (USW entities' facts ¶ 20.)  During the second meeting, Hubbell admitted that she showed the letter to a few of her co-workers in order to get their opinions.  (*Id.*)  World Kitchen investigated the matter further.  (*Id.* ¶ 21.)  Some employees voiced complaints about Hubbell's behavior. (*Id.*)

Hubbell filed a criminal complaint against Crabb on October 28, 2005, claiming that he harassed her.  (Pl.'s App., Ex. 10.)  She alleged that Crabb watched her work on surveillance cameras and that she threatened to have her employment terminated for "picking out bad

---

[1]The term "NAACP" is an acronym which stands for the "National Association for the Advancement of Colored People."  http://naacp.org (as visited January 19, 2010).

glassware." (*Id.* at JH552.)  Members of the Charleroi Police Department advised Hubbell that

her working relationship with Crabb was a civil matter, and that she should contact an attorney if

she wished to take further action.  (*Id.*)  Two days later, on October 30, 2005, Hubbell received

written warnings related to her alleged harassment of other employees and her job performance.

(App. in Supp. of USW entities' Mot. for Summ. J., Exs. G18 & G19.)  The first written warning

concerned "multiple complaints of harassment from co-workers," including complaints

stemming from Hubbell's handwritten letter.  (App. in Supp. of USW entities' Mot. for Summ.

J., Ex. G18.)  The second written warning related to Hubbell's selecting and packaging bad

products, reading while working, and engaging in excessive talking during work hours.  (App. in

Supp. of USW entities' Mot. for Summ. J., Ex G19.)  Both warnings involved potential level 4

violations of the Plant Rules.  (App. in Supp. of USW entities' Mot. for Summ. J., Exs. G18 &

G19.)  Hubbell refused to sign the warnings.  (*Id.*)

      Gladys initiated the grievance procedure in response to the written warnings.  In a

memorandum to World Kitchen sent on November 1, 2005, Gladys expressed the view that the

matter should be expedited to step five of the grievance process.  (App. in Supp. of USW

entities' Mot. for Summ. J., Ex. G20.)  Good responded on November 4, 2005, with a

memorandum denying the grievance and granting the request to have the matter proceed

immediately to step five.  (App. in Supp. of USW entities' Mot. for Summ. J., Ex. G21.)  A

meeting was conducted between Watt, Hubbell and USW District 10 civil rights coordinator

Linda Breeden ("Breeden") on March 13, 2006.  (USW entities' facts ¶ 25.)  At the meeting,

Hubbell was asked about the allegations contained in the written warnings.  (*Id.*)  Hubbell found

those inquiries to be "retarded" and "stupid."  (*Id.*)  Hubbell complained about several unpleasant

10

encounters that she experienced with her co-workers, some of which occurred outside the workplace. (*Id.* ¶ 26.) After listening to Hubbell's complaints, Breeden suggested that Hubbell consider participating in anger management classes. (*Id.* ¶ 28.) Hubbell rejected that suggestion. (*Id.*) The grievance procedure became sidetracked due to negotiations over a new collective bargaining agreement. (*Id.* ¶ 29.)

Hubbell complained in 2006 that Larry Crawford ("Crawford"), a male employee, was permitted to work overtime on Good Friday. (*Id.* ¶ 35.) Good Friday fell on April 14, 2006. (*Id.*) Hubbell contended that Crawford was provided with this opportunity in violation of World Kitchen's overtime rules. (*Id.*) Gladys did not pursue a grievance concerning this issue because he believed the assignment of overtime to Crawford was correct. (*Id.* ¶ 36.) Hubbell voiced similar complaints about an overtime assignment made on May 22, 2006, but she did not file a formal complaint regarding the matter. (*Id.* ¶ 37.)

Because of safety concerns, World Kitchen requires selectors to wear gloves on both hands while working. (*Id.* ¶ 39.) On June 1, 2006, Hubbell and Don Kearns ("Kearns"), a male employee, were each wearing only one glove during an early morning shift. (*Id.* ¶ 40.) Crabb approached them and told them to wear gloves on both hands. (*Id.*) Kearns immediately pulled out a second glove and put it on his exposed hand. (*Id.*) Crabb told Hubbell to put on a glove that was laying nearby, but she refused to do so because the glove was not clean. (*Id.*) It had recently been worn by another employee. (*Id.*) Crabb retrieved a clean pair of gloves for Hubbell to wear. (*Id.*) Crabb issued a warning ticket to Hubbell for not wearing gloves on November 11, 2005. (App. in Supp. of USW entities' Mot. for Summ. J., Ex. G29.) Approximately one hour after his encounter with Hubbell and Kearns, Crabb sent Good an email

11

complaining about Hubbell's reaction to his request that she wear two gloves while on duty. (App. in Supp. of USW entities' Mot. for Summ. J., Ex. G28.)

On June 22, 2006, Hubbell received a ten-day suspension for failing to wear two gloves on June 1, 2006, and for insubordination related to that incident.  (App. in Supp. of USW entities' Mot. for Summ. J., Ex. G27.)  The written notification of that action reported that Hubbell explicitly encouraged Crabb to "write her up" for failing to wear two gloves.  (*Id.*) Hubbell responded on July 9, 2006, by filing with the EEOC charges of discrimination against World Kitchen and the USW entities.  (App. in Supp. of USW entities' Mot. for Summ. J., Exs. G31 & G32.)  The charges were dual-filed with the PHRC.  (App. in Supp. of USW entities' Mot. for Summ. J., Ex. G31.)

Patrick J. Cahill ("Cahill"), the new president of USW Local 53, initiated the grievance procedure in connection with Hubbell's suspension on August 9, 2006, demanding that she "be made whole in every way."  (App. in Supp. of USW entities' Mot. for Summ. J., Ex. 30.)  Later that month, however, Watt viewed a surveillance tape depicting Hubbell's conduct on June 1, 2006.  (USW entities' facts ¶ 45.)  After viewing the tape and observing Hubbell's reaction to Crabb's instructions, Watt concluded that the grievance was lacking in merit.  (*Id.*) Consequently, the grievance concerning Hubbell's suspension was not pursued further.  (*Id.*)

In September 2006, Watt turned his attention to the grievance concerning the written warnings that Hubbell received on October 30, 2005.  In a letter dated September 13, 2006, Watt informed Hubbell that, in his view, the written warning concerning Hubbell's alleged harassment of other employees was justified.[2]  (App. in Supp. of USW entities' Mot. for Summ. J., Ex. G24.)

---

[2]Hubbell contends that she never received Watt's letter.  (USW entities' facts ¶ 31.)

12

In that same letter, Watt stated that his investigation failed to reveal evidence supporting the written warning concerning Hubbell's selection and packaging of bad products, reading while on duty, and excessive talking with co-workers.  (*Id.*)  The matters concerning that written warning were remanded to step three of the grievance process for further review by World Kitchen and USW Local 53.  (*Id.*)  The grievance process was abandoned, however, with respect to the written warning regarding the harassment allegations.  (*Id.*)  In a separate letter addressed to Frank N. Nimesheim ("Nimesheim"), World Kitchen's director of human resources, Watt demanded that World Kitchen remove the second written warning from its records.  (App. in Supp. of USW entities' Mot. for Summ. J., Ex. G25.)  Nimesheim responded on September 21, 2006, with an email informing Watt that a surveillance tape depicted Hubbell reading while on duty.  (App. in Supp. of USW entities' Mot. for Summ. J., Ex. G26.)  He suggested that Watt and Cahill view the tape.  (*Id.*)  Watt viewed the tape and concluded that the written warning was justified.  (USW entities' facts ¶ 33.)  He decided not to proceed further with the grievance process.  (*Id.*)  Hubbell never viewed the tape.  (*Id.* ¶ 34.)

After the EEOC concluded its investigation, it issued a "right to sue" letter to Hubbell. (*Id.* ¶ 56.)  On December 21, 2006, Hubbell commenced this action against World Kitchen, Crabb and the USW entities, alleging violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, and the Pennsylvania Human Relations Act ("PHRA"), 43 PA. CONS. STAT. § 951 *et seq.*[3]  (Compl. (Doc. No. 1).)

---

[3] World Kitchen mistakenly believes that Hubbell is asserting claims under 42 U.S.C. § 1981.  (World Kitchen's Mem. in Supp. of Mot. for Summ. J. (Doc. No. 53) at 2.)  A plain reading of Hubbell's complaint indicates that she is seeking remedies available under 42 U.S.C. § 1981a, which provides for the recovery of compensatory

Throughout the course of her employment, Hubbell frequently clashed with Crabb. (USW entities' facts ¶¶ 47-54.)  She complained to Gladys and Clark about the manner in which Crabb was treating her.  (*Id.* ¶ 53.)  Neither Gladys nor Clark believed that the pursuit of a grievance was appropriate.  (*Id.*)  In response to further complaints from Hubbell, Watt spoke with Gladys, who indicated that he spoke with Crabb about Crabb's interactions with his subordinates.  (*Id.* ¶ 54.)  Several other World Kitchen employees complained about Crabb's behavior in the workplace.  (*Id.* ¶ 48.)  Crabb screamed at employees when he was unhappy with their selection or rejection of products.  (*Id.*)  In response to multiple complaints about Crabb's management style, World Kitchen placed him on a performance improvement plan and sent him to anger management classes.  (*Id.* ¶ 52.)  Crabb's employment with World Kitchen was terminated on December 11, 2007, after it was determined that he did not satisfy the requirements of his performance improvement plan.  (*Id.*)

In November 2007, Hubbell received a thirty-day suspension for throwing a dead bird onto a conveyor belt.  (*Id.* ¶ 58.)  In July 2008, she received a ninety-day suspension after engaging in a verbal confrontation with Cavallucci, her new supervisor, concerning her alleged failure to wear her hair in conformity with World Kitchen's safety rules.  (*Id.* ¶ 59.)  Hubbell presented the EEOC with new charges of discrimination against World Kitchen and the USW entities on December 4, 2008, contending that her suspensions were imposed because of her race,

---

and punitive damages and for the right to a jury trial when those damages are sought in Title VII cases involving "intentional discrimination."  42 U.S.C. § 1981a(a)(1), (b)-(c).  While § 1981a provides for the availability of certain *remedies* in the relevant category of Title VII cases, the underlying claims arise directly under Title VII.  *Huckabay v. Moore*, 142 F.3d 233, 241 (5th Cir. 1998); *Pollard v. Wawa Food Market*, 366 F. Supp. 2d 247, 250-52 (E.D. Pa. 2005); *Powers v. Pinkerton, Inc.*, 28 F. Supp. 2d 463, 472 (N.D. Ohio 1997); *Krouse v. American Sterilizer Co.*, 984 F. Supp. 891, 899 (W.D. Pa. 1996); *Presutti v. Felton Brush, Inc.*, 927 F. Supp. 545, 550 (D.N.H. 1995); *Swartzbaugh v. State Farm Insurance Companies*, 924 F. Supp. 932, 934 (E.D. Mo. 1995); *West v. Boeing Co.*, 851 F. Supp. 395, 401 (D. Kan. 1994).

sex and age.  (*Id.* ¶ 60.)  These charges were dual-filed with the PHRC.  (App. in Supp. of USW

entities' Mot. for Summ. J., Ex. G33.)

The parties stipulated to the dismissal of Crabb as a defendant in this action on February

12, 2009.  (Doc. No. 46.)  On April 24, 2009, World Kitchen filed a motion for summary

judgment (Doc. No. 52); on that same date, the USW entities separately filed a motion for

summary judgment (Doc. No. 56).  These motions are the subject of this memorandum opinion.

The EEOC charges concerning Hubbell's 2007 and 2008 suspensions ultimately resulted

in the issuance of a "right to sue" letter.  On July 29, 2009, Hubbell commenced a separate action

against World Kitchen and the USW entities, alleging additional violations of Title VII, the

ADEA and the PHRA.  (Civil Action No. 09-989, Doc. No. 1.)

## III.   *Standard of Review*

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if,

drawing all reasonable inferences in favor of the nonmoving party, "the pleadings, the discovery

and disclosure materials on file, and any affidavits show that there is no genuine issue as to any

material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P.

56(c).  A motion for summary judgment will not be defeated by the mere existence of some

disputed facts, but will be defeated only if there is a genuine issue of material fact.  *Anderson v.

Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  In determining whether a dispute is genuine,

the court's function is not to weigh the evidence or to determine the truth of the matter, but only

to determine whether the evidence of record is such that a reasonable jury could return a verdict

for the nonmoving party.  *Id.* at 249.

## IV.   *Discussion*

15

Hubbell asserts a myriad of discrimination and retaliation claims against World Kitchen and the USW entities. She contends that World Kitchen discriminated against her on the basis of race, sex and age by denying her opportunities to earn overtime pay during the spring of 2006, suspending her on June 22, 2006, and subjecting her to a hostile work environment.[4] (Pl.'s Br. in Opp. to Defs.' Mot. for Summ. J. (Doc. No. 69) at 14-20.) She argues that the written warnings of October 30, 2005, were issued in retaliation for the police report that she filed against Crabb two days earlier. (*Id.* at 25.) Hubbell claims that the USW entities discriminated against her by failing vigorously to pursue grievances related to the actions taken against her by World Kitchen, and by causing her letter to Clark to be posted in the workplace. (*Id.* at 21-24.) World Kitchen and the USW entities move for summary judgment with respect to all claims contained in Hubbell's complaint. (Doc. Nos. 52 & 56.)

### A. The Discrimination Claims Against World Kitchen

### 1. General Framework

Hubbell's discrimination claims against World Kitchen are predicated on Title VII, the ADEA and the PHRA. Title VII's antidiscrimination provision, which is codified at 42 U.S.C. § 2000e-2(a), provides:

**§ 2000e-2.  Unlawful employment practices**

**(a) Employer practices.** It shall be an unlawful employment practice for an employer--

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of

---

[4]It is undisputed that World Kitchen is an "employer" within the meaning of 42 U.S.C. § 2000e(b), 29 U.S.C. § 630(b), and 43 PA. CONS. STAT. § 954(b).

16

employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a).  During the applicable period of time, Hubbell was an "employee"

entitled to statutory protection under Title VII.  42 U.S.C. § 2000e(f).  The ADEA's

antidiscrimination provision, which is codified at 29 U.S.C. § 623(a), provides:

### § 623.  Prohibition of age discrimination

**(a) Employer practices.**  It shall be unlawful for an employer--

(1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age;

(2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age; or

(3) to reduce the wage rate of any employee in order to comply with this chapter.

29 U.S.C. § 623(a).  The ADEA provides that its prohibitions are "limited to individuals who are

at least 40 years of age."[5]  29 U.S.C. § 631(a).  Because Hubbell reached the age of 40 on

October 15, 2002, she was entitled to statutory protection under the ADEA during the period of

---

[5]The ADEA is different from other antidiscrimination statutes in that it only prohibits discrimination in one direction (i.e., discrimination which favors the young and disfavors the old).  It does not prohibit employers from discriminating against younger employees.  In *General Dynamics Land Systems, Inc. v. Cline*, 540 U.S. 581, 594-600 (2004), the United States Supreme Court held that the words "because of such individual's age," as they appear in 29 U.S.C. § 623(a), essentially mean "because of such individual's [old or advanced] age."

time relevant to this case.  Hubbell enjoyed similar statutory protection under the PHRA, which

declares it to be an "unlawful discriminatory practice"

> [f]or any employer because of the race, color, religious creed,
> ancestry, age, sex, national origin or non-job related handicap or
> disability . . . of any individual or independent contractor, to refuse
> to hire or to contract with, or to bar or to discharge from employment
> such individual or independent contractor, or to otherwise
> discriminate against such individual or independent contractor with
> respect to compensation, hire, tenure, terms, conditions or privileges
> of employment or contract, if the individual or independent
> contractor is the best able and most competent to perform the
> services required.

43 PA. CONS. STAT. § 955(a).

Although the PHRA is a statute of independent force under Pennsylvania law, it has

generally been construed to be coextensive with its federal counterparts.  *Kelly v. Drexel Univ.*,

94 F.3d 102, 105 (3d Cir. 1996).  For this reason, in the absence of contrary authority from the

Pennsylvania courts, the provisions of the PHRA are typically construed in the same manner as

the corresponding federal antidiscrimination provisions unless the relevant statutory language

indicates that a different construction is warranted.  *Fogleman v. Mercy Hospital, Inc.*, 283 F.3d

561, 567 (3d Cir. 2002).  Individuals may not be held liable under Title VII and the ADEA.  *Hill*

*v. Borough of Kutztown*, 455 F.3d 225, 246, n.29 (3d Cir. 2006); *Kachmar v. Sungard Data Sys.,*

*Inc.*, 109 F.3d 173, 183-184 (3d Cir. 1997).  The PHRA, however, contains a provision declaring

it to be an "unlawful discriminatory practice" for "any person" to "aid, abet, incite, compel or

coerce" the commission of an act proscribed thereunder.  43 PA. CONS. STAT. § 955(e).  This

provision has been construed to impose individual liability on supervisors who aid and abet

unlawful discrimination.  *Dici v. Commonwealth of Pennsylvania*, 91 F.3d 542, 552-53 (3d Cir.

18

1996).  When she initially commenced this action, Hubbell asserted "aiding and abetting" claims

against Crabb under the PHRA.  (Compl. ¶¶ 26-28.)  On February 12, 2009, Hubbell stipulated to

the dismissal of Crabb as a defendant in this case.  (Joint Stipulation for Voluntary Dismissal

with Prejudice (Doc. No. 46).)  Consequently, the "aiding and abetting" claims against Crabb are

no longer before the court.  The remaining substantive issues in this case do not implicate

material differences between the language contained in the PHRA and the language contained in

the corresponding federal statutes.  Therefore, the adjudication of Hubbell's claims under Title

VII and the ADEA will also be dispositive of her claims under the PHRA.

Since this is an employment discrimination case in which no direct evidence of

discrimination is presented, the United States Supreme Court's analyses in *McDonnell Douglas*

*Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Dept. of Community Affairs v. Burdine*, 450 U.S.

248 (1981), provide the formulation for allocating the requisite burdens of proof and production

for purposes of World Kitchen's motion for summary judgment.[6]  In an employment

discrimination case of this kind, the plaintiff must establish a prima facie case of illegal

discrimination.  *McDonnell Douglas*, 411 U.S. at 802.  The plaintiff's burden of establishing a

prima facie case of disparate treatment is not onerous.  *Burdine*, 450 U.S. at 253.  In order to

establish a prima facie case of discrimination, the plaintiff need only show that: (1) he or she was

a member of a statutorily-protected class; (2) he or she was qualified for the position; (3) he or

she was aggrieved by an adverse employment action; and (3) the adverse employment action

---

[6]The *McDonnell Douglas* framework does not apply in an employment discrimination case in which direct
evidence of discrimination is presented. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002).  "Direct evidence"
of discrimination is evidence that is "so revealing of discriminatory animus that it is not necessary to rely on any
presumption" from the plaintiff's prima facie case to shift the applicable burden of production to the defendant.
*Starceski v. Westinghouse Electric Corp.*, 54 F.3d 1089, 1096 (3d Cir. 1995).  The evidence presented by Hubbell
does not meet this standard.

occurred under circumstances giving rise to an inference of illegal discrimination.  *Cobetto v. Wyeth Pharms.*, 619 F. Supp. 2d 142, 153 (W.D. Pa. 2007).  The specific elements of a prima facie case generally "depend on the facts of the particular case" before the court and "cannot be established on a one-size-fits-all basis."  *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 411 (3d Cir. 1999).  The prima facie inquiry "remains flexible and must be tailored to fit the specific context in which it is applied."  *Sarullo v. USPS*, 352 F.3d 789, 797-98 (3d Cir. 2003).  A prima facie case "raises an inference of discrimination" sufficient to shift the burden of production to the defendant because the court presumes that certain actions, if left unexplained, were "more likely than not based on the consideration of impermissible factors."  *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978).

If the plaintiff establishes a prima facie case of discrimination, the burden of production shifts to the defendant to rebut the presumption of discrimination through the introduction of admissible evidence indicating that the challenged employment action was taken for legitimate, nondiscriminatory reasons.  *Burdine*, 450 U.S. at 254-55.  To sustain this burden, "[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons."  *Id.* at 254.  The inquiry concerning whether the defendant met its burden of production "can involve no credibility assessment," since "the burden-of-production determination necessarily *precedes* the credibility-assessment stage."  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993).  The defendant satisfies its burden of production, and rebuts the plaintiff's prima facie showing of discrimination, simply by introducing admissible evidence that, if "*taken as true*, would *permit*" a finding that the challenged employment action was taken for legitimate, nondiscriminatory reasons.  *Id.*

If the defendant meets its burden of production, the dispositive factual issue is framed with "sufficient clarity" to provide the plaintiff with "a full and fair opportunity to demonstrate pretext." *Burdine*, 450 U.S. at 255-56.  In order to establish that the defendant is liable for illegal employment discrimination, the plaintiff must ultimately convince the trier of fact that a discriminatory animus was the *real reason* for the adverse employment action at issue.  *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994).  Liability cannot be established upon a jury's mere *disbelief* of the defendant's proffered reasons for an adverse employment action, but rather upon the jury's *affirmative belief* of the plaintiff's contention that the action was taken on the basis of an impermissible discriminatory criterion.  *St. Mary's Honor Ctr.*, 509 U.S. at 519 ("It is not enough, in other words, to *dis* believe [sic] the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination.").  Evidence that an employer's proffered reasons for an adverse employment action are false, when coupled with a plaintiff's prima facie case, may sufficiently undermine the employer's credibility to enable a reasonable trier of fact to conclude that illegal discrimination has occurred.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147-48 (2000).

Evidence used to establish a prima facie case of discrimination may also be relied upon to demonstrate pretext, since nothing about the *McDonnell Douglas-Burdine* framework requires a court to ration the evidence presented in a particular case among the prima facie and pretext stages of the plaintiff's case.  *Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358, 370 (3d Cir. 2008).  Proof that an employer's explanation for an adverse employment action is unworthy of credence can be a powerful form of circumstantial evidence that is probative of intentional discrimination.  *Reeves*, 530 U.S. at 147.  Circumstantial evidence is not only sufficient to sustain

a finding of liability for intentional discrimination, "'but may also be more certain, satisfying and persuasive than direct evidence.'"  *Desert Palace*, 539 U.S. at 100 (quoting *Rogers v. Missouri Pac. R.R.*, 352 U.S. 500, 508 n.17 (1957)).  Depending on the circumstances of the particular case at issue, a plaintiff can sometimes prevail on the basis of circumstantial evidence without introducing "additional, independent evidence of discrimination."  *Reeves*, 530 U.S. at 149.

"To discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent."  *Fuentes*, 32 F.3d at 765.  The plaintiff has the burden of persuasion to prove that the defendant's real reason for terminating the plaintiff was in fact discriminatory.  *Id.* at 764.  The United States Court of Appeals for the Third Circuit in *Fuentes* set forth a two-pronged analysis for considering how a plaintiff may show that the reason given by defendant was discriminatory.

> [A] plaintiff who has made out a prima facie case may defeat a motion for summary judgment by *either* (i) discrediting the proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action. . . . [T]he plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that *each* of the employer's proffered non-discriminatory reasons, . . .  was either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext).

*Id.* (internal citations omitted).  This standard places a difficult burden on the plaintiff.  *Id.*  The two prongs of the *Fuentes* test are distinct.  *See Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108-13 (3d Cir. 1997) (analyzing ADEA action under both prongs of *Fuentes*

22

framework).

## 2.    The Hostile Work Environment Claims

In her complaint, Hubbell avers that, since the commencement of her employment with World Kitchen in 2000, she was "subjected to a continuous and ongoing hostile work environment" because of her race, sex and age.  (Compl. ¶ 12(a).)  The basis for her hostile work environment claims is Crabb's alleged harassment of her.  (*Id.* ¶¶ 12(a)-(c).)  Before considering the merits of these claims, the court must first address World Kitchen's arguments concerning the timeliness of Hubbell's EEOC charge and the effect of the settlement agreement.

Hubbell's EEOC charge against World Kitchen was filed on July 9, 2006.[7]  (App. in Supp. of USW entities' Mot. for Summ. J., Exs. G31 & G32.)  Because Pennsylvania is a "deferral" jurisdiction, Hubbell's EEOC charge needed to be filed within 300 days of the alleged "unlawful employment practice" in order for her claims to be timely filed.  42 U.S.C. § 2000e-5(e)(1); *Bailey v. United Airlines*, 279 F.3d 194, 197 (3d Cir. 2002).  For purposes of this case, the applicable "charging period" includes the period of time elapsing between September 12, 2005, and July 9, 2006.

In *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002), the Supreme Court explained that because the creation or perpetration of a "hostile work environment" constitutes a single "unlawful employment practice," "the entire time period of the hostile environment may be considered by a court for the purposes of determining liability" as long as

---

[7]The court deems the EEOC charge to have been filed as of July 9, 2006, because that is the date on which Hubbell signed a document that could reasonably be construed as a request that the EEOC take remedial action to protect her rights under Title VII and the ADEA.  *See Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 402 (2008); *Holender v. Mut. Indus. N., Inc.*, 527 F.3d 352, 355-56 (3d Cir. 2008).

one act "contributing" to the plaintiff's claim occurs within the applicable charging period.  The

Supreme Court distinguished hostile work environment claims from claims arising from

"[d]iscrete acts such as termination, failure to promote, denial of transfer, [and] refusal to hire,"

which are timely only where an EEOC charge is filed within the 300- or 180-day limitations

period.  *Morgan*, 536 U.S. at 114.  Hubbell concedes that her 2004 discharge was a "discrete act"

under *Morgan*, and that she cannot pursue claims based on that occurrence in this case.[8]  (Pl.'s

Br. in Opp. To Defs.' Mot. for Summ. J. at 13.)  World Kitchen argues that the court cannot

consider events predating the charging period in determining whether Hubbell can proceed with

hostile work environment claims.  (World Kitchen's Mem. in Supp. of Mot. for Summ. J. at 5-6.)

This argument is without merit, since the Supreme Court made clear in *Morgan* that

"[s]ubsequent events" may be a part of "one hostile work environment," and that "a charge may

be filed at a later date and still encompass the whole."  *Morgan*, 536 U.S. at 117.  In determining

whether Hubbell's hostile work environment claims can survive World Kitchen's motion for

summary judgment, the court need not limit its consideration to events occurring within the 300-

day charging period.[9]

---

[8]Claims arising from discrete acts of discrimination occurring prior to the applicable charging period are untimely even if they are somehow related to a timely claim.  *Mikula v. Allegheny County*, 583 F.3d 181, 185-86 (3d Cir. 2009).

[9]Because Hubbell's complaint is vaguely worded, it is somewhat difficult for the court to determine the precise factual bases for her claims.  (*See* Compl. ¶¶ 11-25.)  In her deposition, Hubbell testified that several African-American employees voiced baseless complaints about her work prior to her 2004 termination.  (Pl.'s App., Ex. 1 at 103-04.)  It is not clear whether she seeks to pursue a race-based hostile work environment claim based on such complaints.  (Pl.'s Br. in Opp. To Defs.' Mot. for Summ. J. at 20.)  In any event, such a race-based claim under Title VII would be distinct from the sex- and age-based claims under Title VII and the ADEA that Hubbell bases on Crabb's treatment of her.  In order for a race-based hostile work environment claim to be timely, at least one incident "contributing to the claim" would have to be within the 300-day charging period.  *Morgan*, 536 U.S. at 117.  To the extent that Hubbell seeks to assert a race-based hostile work environment claim related to the "harassment" alleged to have occurred in 2004, that claim is clearly time-barred.

World Kitchen appears to believe that the settlement agreement of November 17, 2004, precludes the court from considering acts of harassment alleged to have occurred in 2004 in determining whether Hubbell can proceed with her hostile work environment claims.  (World Kitchen's Mem. in Supp. of Mot. for Summ. J. at 7-8.)  It is axiomatic that one who agrees to settle his or her claim cannot subsequently seek both the benefit of the settlement agreement and the opportunity to pursue the claim that he or she already agreed to settle.  *See Kirby v. Dole*, 736 F.2d 661, 664 (11th Cir. 1984).  This general rule is applicable to matters within the purview of an EEOC charge.  *See Spiridigliozzi v. Bethlehem Mines Corp.*, 558 F. Supp. 734, 736 (W.D. Pa. 1980).  An individual may waive his or her claim under a federal antidiscrimination statute as a part of a voluntary settlement agreement.  *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 52 (1974).  Whether such a waiver exists will depend upon the terms of the settlement agreement. The existence of a waiver of a particular claim cannot be inferred simply from the mere execution of a generic agreement purporting to settle a matter between the parties to a dispute. *Kawatra v. Medgar Evers Coll.*, 700 F. Supp. 648, 651-52 (E.D.N.Y. 1988).

The settlement agreement executed on November 17, 2004, provided that Hubbell would be returned to work "without loss of seniority" and "without loss of wages," she would be provided with the estimated amount of overtime wages that she would have earned had she not been discharged, she would be required to undergo a return-to-work physical examination performed by the "plant doctor," and the specific date of her return would be communicated to her after the posting of a schedule applicable to employees working at World Kitchen's Charleroi plant.  (App. in Supp. of USW entities' Mot. for Summ. J., Ex. G12.)  The agreement included the following statement: "No other conditions apply to this settlement."  (*Id.*)  World Kitchen

subsequently increased the gross amount of its monetary payment to Hubbell from $11,494.24 to

$12,203.83.  (App. in Supp. of USW entities' Mot. for Summ. J., Ex. G14.)  The record does not

include evidence indicating that Hubbell agreed to waive potential hostile work environment

claims related to Crabb's behavior.  In light of the statement in the settlement agreement

specifically disclaiming the presence of unwritten "conditions," the court cannot conclude that

Hubbell is precluded from relying on presettlement events to support her hostile work

environment claims.

Title VII provides that it is an "unlawful employment practice" for an employer "to

discriminate against any individual with respect to his [or her] compensation, terms, conditions,

or privileges of employment, because of such individual's race, color, religion, sex, or national

origin . . . ."  42 U.S.C. § 2000e-2(a)(1).  In *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57,

63-69 (1986), the Supreme Court recognized that an employer *discriminates* against an employee

*because of his or her sex* when it engages in sex-based harassment that is sufficiently "severe or

pervasive" to alter the "terms, conditions, or privileges" of his or her employment.  The holding

in *Meritor Savings Bank* applies with equal force to harassment based on an individual's race,

color, religion or national origin.  *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 276

n.5 (3d Cir. 2001).  Harassment which does not alter the "terms, conditions, or privileges" of

one's employment, however reprehensible it may be, does not run afoul of Title VII.  *Meritor*

*Sav. Bank*, 477 U.S. at 67.  An isolated incident amounts to a change in the terms, conditions, or

privileges of one's employment only if it is "extremely serious."  *Faragher v. City of Boca*

*Raton*, 524 U.S. 775, 788 (1998).  In the sexual harassment context, the Supreme Court has

admonished that Title VII "does not reach genuine but innocuous differences in the ways men

and women routinely interact with members of the same sex and of the opposite sex." *Oncale v. Sundower Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998). Title VII's antidiscrimination provision prohibits only those forms of discriminatory harassment that are severe or pervasive enough to create a hostile or abusive working environment. *Pa. State Police v. Suders*, 542 U.S. 129, 146-47 (2004).

The inquiry concerning whether an employee's working environment is sufficiently hostile or abusive to constitute a violation of Title VII encompasses both objective and subjective components. In *Harris v. Forklift Systems, Inc.*, 510 U.S. 17 (1993), the Supreme Court explained:

> Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment–an environment that a reasonable person would find hostile or abusive–is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

*Harris*, 510 U.S. at 21-22. This test, which is not "mathematically precise," accounts for all relevant factors. *Id.* at 22. Such factors include, but are not limited to, whether the alleged discriminatory harassment is frequent, whether it is severe, whether it is physically threatening or humiliating, and whether it unreasonably interferes with the employee's work performance. *Id.* at 23.

The ADEA provides that it is unlawful for an employer to "discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's age . . . ." 29 U.S.C. § 623(a)(1). Because this statutory language (aside from the relevant discriminatory criterion) mirrors the language

27

contained in Title VII, district courts within this circuit have recognized that hostile work environment claims are cognizable under the ADEA. *Slater v. Susquehanna County*, 613 F. Supp. 2d 653, 667 (M.D. Pa. 2009); *Beauburn v. Thomas Jefferson Univ.*, 578 F. Supp. 2d 777, 783 n.8 (E.D. Pa. 2008). The Pennsylvania courts have held that hostile work environment claims are cognizable under the PHRA. *Phila. Hous. Auth. v. Am. Fed'n of State, County & Mun. Employees*, 956 A.2d 477, 484 (Pa. Commw. Ct. 2008); *Raya & Haig Hair Salon v. Pa. Human Relations Comm'n*, 915 A.2d 728, 732-733 (Pa. Commw. Ct. 2007); *Infinity Broad. Corp. v. Pa. Human Relations Comm'n*, 893 A.2d 151, 157-59 (Pa. Commw. Ct. 2006).

Title VII, the ADEA and the PHRA are all statutes directed at *discrimination*. For this reason, "an environment which is equally harsh for both men and women or for both young and old does not constitute a hostile work environment under the civil rights statutes." *Brennan v. Metro. Opera Ass'n*, 192 F.3d 310, 318 (2d Cir. 1999). In other words, an employer which *indiscriminately* subjects its employees to a hostile work environment commits no violation of Title VII, the ADEA or the PHRA. *Lack v. Wal-Mart Stores, Inc.*, 240 F.3d 255, 261-262 (4th Cir. 2001); *Holman v. Indiana*, 211 F.3d 399, 403-07 (7th Cir. 2000); *Lavack v. Owen's World Wide Enter. Network, Inc.*, 409 F. Supp. 2d 848, 854-56 (E.D. Mich. 2005). Referencing sex discrimination claims arising under Title VII in *Oncale v. Sundower Offshore Services, Inc.*, 523 U.S. 75 (1998), the Supreme Court observed:

> Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at "*discrimination* . . . because of . . . sex." We have never held that workplace harassment, even harassment between men and women, is automatically discrimination because of sex merely because the words used have sexual content or connotations. "The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or

conditions of employment to which members of the other sex are not
exposed." *Harris*, *supra*, at 25 (GINSBURG, J., concurring).

*Oncale*, 523 U.S. at 80.

In order to defeat a motion for summary judgment, a plaintiff seeking to advance a hostile

work environment claim must present some evidence indicating that the harassing conduct of

which he or she complains can be traced to his or her statutorily-protected trait. *See Brown v.*

*Henderson*, 115 F. Supp. 2d 445, 450-51 (S.D.N.Y. 2000).  Title VII, the ADEA and the PHRA

do not countenance a "cause of action for mere unpleasantness" in the workplace. *Hartsell v.*

*Duplex Prods., Inc.*, 123 F.3d 766, 773 (4th Cir. 1997).  In other words, one of the elements a

plaintiff must establish for a prima facie hostile work environment case is that the conduct in

issue was motivated by the fact that the plaintiff is a member of a protected class. *See Koschoff*

*v. Henderson*, 109 F. Supp. 2d 332, 346 (E.D. Pa. 2000) ("mistreatment and disrespect

unmotivated by the plaintiff's [statutorily-protected trait] does not create a hostile work

environment").

Although it is undisputed that Crabb yelled at Hubbell on several occasions, and that he

was ultimately terminated by World Kitchen because of his management style, the record

contains no evidence which indicates that Crabb *discriminated* against Hubbell "because of" her

race, sex or age.  Declarations submitted by Watt and Clark indicate that both male and female

employees voiced complaints about Crabb prior to his termination.  (App. in Supp. of USW

entities' Mot. for Summ. J., Ex. A ¶ 44 & Ex. C ¶ 3.)  In his declaration, Clark specifically stated

that "various" male and female employees complained to him about Crabb "holler[ing]" at them.

(App. in Supp. of USW entities' Mot. for Summ. J., Ex. C ¶ 3.)  Good testified in his deposition

29

that Hubbell never accused Crabb of inappropriately "touching" or "hitting" her.  (Pl.'s App., Ex.

5 at 36-37.)  Hubbell points to no evidence which contradicts the declarations and testimony of

Watt, Clark and Good.

      In her deposition, Hubbell gave the following testimony concerning Crabb's motivation

for frequently "yelling" at her:

> Q.     Robert Crabb is white as well?
>
> A.     Yes.
>
> Q.     Why do you think he is doing this to you because you're white?
>
> A.     Well, I don't know if it's, you know, so much in that area that.  He seems to have a problem with older women in general.
>
> Q.     So you think--
>
> A.     The younger ones he didn't seem to have a problem with.
>
> Q.     So it's not the race, it's the age and the sex?
>
> A.     Well, with him, yeah, I don't think it's so much the race.  I mean the age and the fact that I'm a woman.  He didn't seem to appreciate I guess me having like authority over ware being dumped or being thrown away.  He didn't like -- I guess he had a problem with a woman having a little power in a situation.
>
> Q.     Let's talk about the older part.  Do you consider yourself to be old?
>
> A.     Yeah, I'm getting there, yeah.
>
> Q.     At the time that you filed your charge and made these allegations you were about 42 years old?
>
> A.     Probably.

Q.    Again, your date of birth is 10-15-62?

A.    Yeah, yes.

Q.    Do you know how old Robert Crabb is?

A.    I know he's younger than I am, but he's around -- I think he's three or four years younger than me.

Q.    Would it surprise you to know that he's actually a year and six months younger than you?

A.    No, I knew that he was a little younger than me. I thought it was around three years, but, no, that doesn't surprise me. He actually looks older than what he is.

Q.    If I told you that according to employment records his date of birth is May 1st, 1964, would you have any reason to believe that's not accurate?

A.    No, I found out that he is younger than me, and, like I said, he looks older than what he is.

Q.    Why do you think that he would not like you or harass you because you were his same age or about a year older than him?

A.    As I said, he seemed to have a problem with older women. He didn't seem to have a problem with the younger ones, it seemed to be the older women.

Q.    Well, is it just the woman part or is it the old and the woman part?

A.    I think the older women.

Q.    So he's okay with young women?

A.    Yeah, he seemed to be okay, get along with the younger women.

(Pl.'s App., Ex. 2 at 89-91.)  Hubbell expressly stated that she did not believe that Crabb's

31

mistreatment of her was motivated by her race.  She testified that Crabb did not have a problem with "younger women."  (*Id.*)

The difference in age between Hubbell and Crabb was minimal.  *Hicks v. Tech Indus.*, 512 F. Supp. 2d 338, 347 (W.D. Pa. 2007) (recognizing a two-year age difference as "simply too insignificant to raise a reasonable inference of age discrimination").  "Because of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of their group."  *Castaneda v. Partida*, 430 U.S. 482, 499 (1977).  The fact that Crabb generally shared Hubbell's race- and age-related traits does not foreclose Hubbell's hostile work environment claims.  In order to proceed with her claims, however, Hubbell must produce *some* evidence which could lead a reasonable trier of fact to conclude that Crabb harassed her "because of" her race, sex or age. *Roach v. Am. Radio Sys. Corp.*, 80 F. Supp. 2d 530, 532 (W.D. Pa. 1999) (permitting an ADEA claim to proceed to trial because of case-specific evidence giving rise to an inference that the plaintiff had been discharged because of his age, where the plaintiff had been replaced by an individual who was insufficiently younger than him to permit an inference of age discrimination to be drawn solely from the age difference itself).  Hubbell points to no evidence which could support a finding that Crabb harassed her for discriminatory reasons.

The mere fact that Hubbell and Crabb are members of opposite sexes cannot permit an inference of sex discrimination to be drawn.  In *Oncale*, the Supreme Court made the following observations about when an inference of sex discrimination can reasonably be drawn:

> Courts and juries have found the inference of discrimination easy to
> draw in most male-female sexual harassment situations, because the
> challenged conduct typically involves explicit or implicit proposals

of sexual activity; it is reasonable to assume those proposals would not have been made to someone of the same sex.  The same chain of inference would be available to a plaintiff alleging same-sex harassment, if there were credible evidence that the harasser was homosexual.  But harassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex.  A trier of fact might reasonably find such discrimination, for example, if a female victim is harassed in such sex-specific and derogatory terms by another woman as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace.  A same-sex harassment plaintiff may also, of course, offer direct [comparative] evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace.  Whatever evidentiary route the plaintiff chooses to follow, he or she must always prove that the conduct at issue was not merely tinged with sexual connotations, but actually constituted "*discrimina[tion]* . . . because of . . . sex."

*Oncale*, 523 U.S. at 80-81.  In this case, Hubbell does not allege that Crabb made "explicit or implicit proposals of sexual activity," nor does she claim that Crabb used "sex-specific derogatory terms" when referring to her.  Admittedly, an inference of sex-based animus can sometimes be drawn where "a man is aggressively rude to a woman," thereby leading a trier of fact to conclude that such a man "is acting out of a general hostility to the presence of women in the workplace."  *Bibby v. Phila. Coca Cola Bottling Co.*, 260 F.3d 257, 262 (3d Cir. 2001).  Such an inference, however, cannot reasonably be drawn where, as here, the record establishes through uncontradicted evidence that the supervisor in question was an "equal opportunity" harasser.  *Holman*, 211 F.3d at 402-05.

Hubbell argues that World Kitchen should not be permitted to avail itself of the so-called "equal opportunity harasser defense" because it failed to raise this "defense" in its answer to her complaint.  (Pl.'s Br. in Opp. To Defs.' Mot. for Summ. J. at 19-20.)  Federal Rule of Civil Procedure 8(c)(1)(A) provides that, "[i]n responding to a pleading, a party must affirmatively

state any avoidance or affirmative defense . . . ."  FED. R. CIV. P. 8(c)(1).  Hubbell relies on

*Chaloult v. Interstate Brands Corp.*, No. 02-249, 2003 WL 21803319, at **23-25 (D. Me. Aug.

6, 2003), for the proposition that the "'equal opportunity harasser' defense" constitutes an

"avoidance or affirmative defense" within the meaning of Rule 8(c).  (Pl.'s Br. in Opp. To Defs.'

Mot. for Summ. J. at 19.)  In *Chaloult*, the defendant apparently *conceded* that the "equal

opportunity harasser defense" constituted such an "avoidance or affirmative defense."  *Chaloult*,

2003 WL 21803319 at *24 n.69 (noting that the defendant did not contest that the defense

qualified as an affirmative defense or avoidance for purposes of Rule 8(c)).  World Kitchen

makes no such concession in this case.  (World Kitchen's Reply in Supp. of Mot. for Summ. J.

(Doc. No. 78) at 10-12.)

     Hubbell's reliance on Rule 8(c) is unavailing.  An "avoidance or affirmative defense"

typically accepts the allegations contained in a complaint as true and "then goes on to assert new

matter that eliminates or limits the defendant's ordinary liability stemming from those

allegations."  *Gwin v. Curry*, 161 F.R.D. 70, 71 (N.D. Ill. 1995).  In contrast, a so-called

"negative defense" directly challenges the substance of the plaintiff's allegations.  *FTC v. Think

All Publ'g, L.L.C.*, 564 F. Supp. 2d 663, 665 (E.D. Tex. 2008).  In order to state a claim under

Title VII, the ADEA or the PHRA, a plaintiff must allege *discrimination* based on a statutorily-

protected trait.[10]  *Oncale*, 523 U.S. at 80-81.  An attempt by a defendant to show that its alleged

---

[10]Hubbell posits that the so-called "equal opportunity harasser defense" has not been recognized in this circuit, thereby precluding the entry of summary judgment in favor of World Kitchen.  (Pl.'s Br. in Opp. To Defs.' Mot. for Summ. J. at 18.)  This argument is without merit.  In an employment discrimination case like this case, the burden is on the plaintiff to prove the existence of discrimination "because of" a statutorily-protected trait.  *Oncale*, 523 U.S. at 80-81.  Because the Supreme Court has made that clear, a plaintiff's need to prove the existence of trait-based discrimination is clearly established in *all* circuits.  *Abramson*, 260 F.3d at 278-79 (observing in a hostile work environment case brought under Title VII that a plaintiff, in order to defeat a defendant's motion for summary judgment, must present "sufficient evidence to give rise to an inference of discrimination by offering proof" that the

34

harassment of an employee was not based on such a trait, while sometimes referred to as a

"defense," is simply one way of disproving a plaintiff's allegation of discrimination "because of"

that trait. *See Kampmier v. Emeritus Corp.*, 472 F.3d 930, 940-41 (7th Cir. 2007).  It is not akin

to a defendant's attempt to evade liability by invoking a statutory exception that may be properly

regarded as an "avoidance or affirmative defense" within the meaning of Rule 8(c).  *See Oden v.*

*Oktibbeha County*, 246 F.3d 458, 466-67 (5th Cir. 2001).  Hubbell cannot defeat World

Kitchen's motion for summary judgment by the simple expedient of mischaracterizing an attempt

to disprove an element of her prima facie case as an "affirmative defense" subject to the strictures

of Rule 8(c)(1).  Accordingly, World Kitchen's motion for summary judgment will be granted

with respect to Hubbell's "hostile work environment" claims under Title VII, the ADEA and the

PHRA because Hubbell cannot establish the requisite elements of a prima facie hostile work

environment case; i.e., plaintiff failed to adduce sufficient evidence that the alleged conduct was

motivated by her membership in a protected class.

### 3.     Discrimination Claims Relating to the Denial of Overtime Pay

Hubbell contends that she was wrongfully denied overtime hours on two occasions during

the spring of 2006.  (Pl.'s Br. in Opp. To Defs.' Mot. for Summ. J. at 12.)  These appear to be

sex-based discrimination claims under Title VII and the PHRA, since in spring of 2006,

Crawford, a male employee, received the overtime hours that she should have received under the

shared overtime system.  (App. in Supp. of USW entities' Mot. for Summ. J., Ex. G31 at

WKI0560.)  Both Title VII and the PHRA prohibit an employer from discriminating against

employees with respect to their "compensation" on the basis of sex.  42 U.S.C. § 2000e-2(a)(1);

---

defendant's conduct was "based on one of the categories protected under Title VII").

43 PA. CONS. STAT. § 955(a).  Hubbell failed to explain why she should have been awarded overtime hours in addition to what she had already received.  World Kitchen's personnel records indicate that Hubbell actually received overtime pay on one of the occasions referenced in her brief.  (App. to World Kitchen's Concise Statement of Undisputed Material Facts  (Doc. No. 55) ("World Kitchen's App."), Ex. A-11 at 2-3.)

In its brief, World Kitchen advances specific arguments against Hubbell's sex-based compensation claims.  (World Kitchen's Mem. in Supp. of Mot. for Summ. J. at 13-14.)  Hubbell, however, offers no response to those arguments.  Instead, she merely observes that the claims concerning her right to receive overtime pay on terms equal with those enjoyed by male employees are not time-barred.  (Pl.'s Br. in Opp. To Defs.' Mot. for Summ. J. at 12-13.)  The factual and legal bases for these claims are unclear.  It is not the court's responsibility to investigate independently World Kitchen's payroll practices in order to construct an argument for Hubbell.  "'[I]t is not this court's responsibility to research and construct the parties' arguments.'" *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 397 (7th Cir. 2000) (quoting *United States v. Lanzotti*, 205 F.3d 951, 957 (7th Cir. 2000)).  Hubbell's complete failure to articulate a basis for proceeding with her sex-based compensation claims constitutes a waiver of those claims.  *See Spath*, 211 F.3d at 397.  Summary judgment will be entered in favor of World Kitchen with respect to any claims arising from World Kitchen's alleged failure to offer Hubbell overtime hours during the spring of 2006.

### 4.    The Discrimination Claims Concerning the June 2006 Suspension

Hubbell argues that she suffered discrimination when she was suspended in June 2006.  (Pl.'s Br. in Opp. To Defs.' Mot. for Summ. J. at 7.)  This suspension stemmed from an incident

36

occurring on June 1, 2006.  Hubbell was evidently wearing only one glove while working, in violation of the Plant Rules.  (USW entities' facts ¶ 40.)  Kearns, a newly-hired male employee, was also wearing only one glove.  (*Id.*)  When Crabb walked by and instructed Hubbell and Kearns to wear gloves on both hands, Kearns pulled out a second glove and put it on.  (*Id.*)  A verbal exchange between Crabb and Hubbell ensued, leading World Kitchen to suspend Hubbell for a period of ten days.  (*Id.* ¶ 41.)  The circumstances surrounding that verbal exchange are disputed in this case.

At the outset, the court notes that the record contains no evidence from which an inference of race- or age-based discrimination could reasonably be drawn.  Hubbell did not provide the court with Kearns' race or age.  Crabb, a Caucasian, was insufficiently younger than Hubbell to give rise to an inference that he suspended her because of an age-related animus.  *See Potence v. Hazleton Area Sch. Dist.*, 357 F.3d 366, 370 (3d Cir. 2004) ("In order to establish a prima facie case of discrimination, the plaintiff must demonstrate that . . . his or her replacement was sufficiently younger to permit a reasonable inference of age discrimination").  It is not clear whether Hubbell seeks to pursue an ADEA claim or an age-based PHRA claim regarding her suspension.  In any event, to the extent that she asserts such claims, World Kitchen is entitled to summary judgment.  Hubbell acknowledged in her deposition that Crabb had not discriminated against her on the basis of race.  (Pl.'s App., Ex. 1 at 89-91.)  Thus, World Kitchen is also entitled to summary judgment with respect to any race-based discrimination claims under Title VII and the PHRA related to Hubbell's suspension.

Although both Hubbell and Kearns neglected to wear two gloves on June 1, 2006, only Hubbell was suspended.  This difference in treatment is sufficient to give rise to an inference that

World Kitchen discriminated against Hubbell because of her sex.  *See Lightner v. City of Wilmington*, 545 F.3d 260, 264-65 (4th Cir. 2008).  Consequently, with respect to the sex-based discrimination claims under Title VII and the PHRA, the burden of production shifts to World Kitchen to articulate a legitimate, nondiscriminatory reason for suspending Hubbell, and to support that reason through the introduction of admissible evidence.  *Burdine*, 450 U.S. at 254-55.

World Kitchen argues that Hubbell was suspended for insubordination rather than for a simple failure to wear two gloves, and that her insubordination distinguished her conduct from that of Kearns.  (World Kitchen's Mem. in Supp. of Mot. for Summ. J. at 14.)  The record contains evidence to support this assertion.  Hubbell was formally warned on November 11, 2005, that she wrongfully failed to wear gloves on both hands while on duty.  (App. in Supp. of USW entities' Mot. for Summ. J., Ex. G29.)  The written notice of Hubbell's ten-day suspension for the incident of June 1, 2006, which was signed by Good on June 22, 2006, stated the following grounds for discipline:

> **You have been cited as Violating Plant/Safety Rule:**
>
> - Level 1, Number 6
>   - Required safety equipment and PPE, per department, must be worn when performing designated tasks. (i.e. respirators, protective aprons, goggles, steel toed shoes, proper hearing protection, etc.)
>   - On June 1, 2006 employee was not wearing two gloves on line 115. Supervisor instructed employee to put the glove on and she refused stating he was to write her up.  Supervisor returned and employee still refused to wear proper PPE.  Notice of two glove rule posted in plant and employee should be aware.
>   - June 1, 2006
> - Level 3, Number 1

38

- Insubordination and refusal to perform an assigned task will not be permitted.
- On June 1, Supervisor Crabb requested Janice Hubbell to put on the second glove and she refused. Employee asked supervisor Crabb to write her up. The other employee on the line was also without a second glove and when asked, he complied immediately. Ms. Hubbell was insubordinate concerning a direct order from her supervisor to wear her proper PPE and work safely. She refused and evidence is clear she was insubordinate.
- June 1, 2006

(App. in Supp. of USW entities' Mot. for Summ. J., Ex. G27.) In his deposition, Crabb testified:

> Q.    And we talked earlier today about a write-up in June 2006 with Ms. Hubbell. On that incident can you explain for us in a little bit more detail what happened on that particular day? I believe it was June 1st of 2006.
>
> A.    That's the incident with Ms. Hubbell and Don [Kearns] I believe.
>
> Q.    Yes.
>
> A.    I came by the end of the line, I noticed that they were not wearing gloves on both hands. I walked up to Mr. [Kearns], told him -- explained to him -- he was a new hire at this time, I explained to him that gloves have to be worn on both hands so you don't get cut. He said okay, he took his glove out of his pocket, put it on his hands. I leaned over across the belt which would be a good four foot away, I leaned towards Janice and told her she knows better, she's been here long enough, she knows she should have gloves on both hands, and I told her to put gloves on both hands. At that point I left that area, made a round through the automatics department, stopped into the automatics lining coordinator's office to talk with one of my line coordinators, I noticed on a monitor -- this could have been four, five minutes transpired by this time, I noticed on the monitor that Janice still didn't put a glove on. So I went back out to the line. At this time I told her I was going to write her up for not having gloves on both hands. At that point she told me go ahead and write her up.

I said go ahead and put gloves on both hands.  At that point she told me I only have one glove.  I said, well, there's a glove sitting right there on your table.  She said, that's dirty, I'm not wearing it.  She jumped up out of her seat at that point and said I ain't putting that glove on.  I said, where's your gloves.  She said, I'll go get them.  I said, no, I will go get them.  So I walked back to the rack that held the gloves, probably 30 feet from where she was working, grabbed a pair of gloves, came back, gave them to Ms. Hubbell, at that point went back to my office, filled out the safety violation slip and came back out and gave her her copy of it.

Q.      Whose responsibility is it to have gloves with them while they're working?

A.      The employees should pick those gloves up from the glove areas.  There's three or four of them throughout the selecting area to get gloves from.  You can grab a hundred pair a day if need be.

Q.      Did I hear you correctly that there was a bin of clean gloves about 30 or 40 feet from where she was working?

A.      From that selection end, yes, there's some probably no more than 30 foot away.

Q.      On that day did anybody else refuse to put on gloves when you asked them to?

A.      Don [Kearns], the other one I noticed at the same time, had no problems taking his glove out of his pocket and putting it on immediately.

Q.      If Janice had complied with your request in those four or five minutes and put a glove on, do you believe she would have been written up that day?

A.      No, she would have never even got a violation if she would have put it on.

(Pl.'s App., Ex. 4 at 110-13.)  Crabb's testimony is corroborated by an email message that he sent

to Good at 4:18 a.m. on June 1, 2006, in which he complained about Hubbell's reaction to his

verbal order and urged Good to review a surveillance tape of the incident.  (App. in Supp. of USW entities' Mot. for Summ. J., Ex. G28.)  The record also contains an email message from Crabb to Good dated June 5, 2006, describing the incident in a similar manner.  (*Id.*)

Hubbell's ten-day suspension took effect on June 23, 2006.  (App. in Supp. of USW entities' Mot. for Summ. J., Ex. G27.)  She returned to work on July 3, 2006.  (*Id.*)  On August 9, 2006, Cahill initiated the grievance procedure on Hubbell's behalf.  (App. in Supp. of USW entities' Mot. for Summ. J., Ex. G30.)  Watt decided to abandon the grievance procedure later that month, after viewing a surveillance tape of the incident and deciding that the grievance was lacking in merit.  (App. in Supp. of USW entities' Mot. for Summ. J., Ex. A ¶ 43.)

World Kitchen clearly satisfied its burden of production, thereby shifting the factual inquiry "to a new level of specificity."  *Burdine*, 450 U.S. at 255.  The factual issue in this case is now framed with "sufficient clarity" to give Hubbell "a full and fair opportunity to demonstrate pretext."  *Id.* at 255-56.  World Kitchen essentially contends that Hubbell was suspended for *refusing* to wear two gloves rather than for *failing* to wear two gloves.  (World Kitchen's Mem. in Supp. of Mot. for Summ. J. at 14.)  Having established a prima facie case of sex discrimination, Hubbell can defeat World Kitchen's motion for summary judgment by producing sufficient evidence to enable a reasonable trier of fact to conclude either that World Kitchen's "asserted justification" for suspending her is false or that discrimination was more likely than not the reason for her suspension.  *Reeves*, 530 U.S. at 148; *Fuentes*, 32 F.3d at 764.

Hubbell's deposition testimony paints a different picture than does the testimony of Crabb and the documentation supplied by World Kitchen.  In her deposition, Hubbell testified as follows:

Q.      There's some safety rules in working at the plant as far as wearing certain clothing and certain protections; is that right?

A.      Yes.

Q.      And you're aware of a safety rule that you're supposed to have two gloves on your hands?

A.      Yes.

Q.      Is it fair that on this date, June 1st, 2006, you were only wearing one glove?

A.      Yes.

Q.      Your supervisor at the time was Robert Crabb?

A.      Yes.

Q.      He came to you and asked you to put on another glove?

A.      Yes.

Q.      Did you comply with that request?

A.      He asked me to put on the dirty gloves that were on the table next to me, and there was a witness right next to him, standing on the other side, and I said those are dirty gloves, I'm not going to put those on.

Q.      Do you have your own gloves or are there just gloves that everybody shares?

A.      You go get gloves.  There's a little place where you can get them.

Q.      Did you go get other gloves?

A.      Well, I started to go get them, and he started screaming at me, and he went and got them, and I put it on.

Q.      You put it on after he gave it to you?

42

A.      Yeah.

Q.      What do you mean he started screaming at you?

A.      It's on tape.  The whole incident is on tape.

Q.      Well, I'd like your version.

A.      He come over in front of my hamper where I was selecting screaming at me that he was going to write me up, he was going to have me fired, blah, blah, blah and just kept carrying on for a good few minutes.  It's all on tape, you know, and nobody ever investigated, there's no grievance on it.  Nothing was done, no witnesses interviewed.

Q.      Well, when he first told you to put on gloves you refused to do so because they were dirty in your opinion?

A.      I told him, I said, those aren't my gloves, those are dirty.

Q.      And he asked you where are your gloves?

A.      He said, don't you have gloves, I said no, and I started to go get it, and he started screaming at me.

Q.      Did you tell him that you were going to get gloves?

A.      Yeah.

Q.      What did you say?

A.      I said I'm going to go get them.  I can't even remember what he said, but he said I'll get them.  And he brought them back, and I put it on.  And then he came around to my side, he was on the opposite side of the belt.  He came around to my side, stood directly in front of me, standing there screaming at me.

Q.      Saying what?

A.      That he was going to write me up and he was going to have me suspended, terminated, he goes through the whole nine yards.

43

Q.      Because you weren't wearing your gloves?

A.      Yes.

Q.      Now you said that other people don't wear gloves?

A.      Yes.

Q.      On this day who else wasn't wearing their gloves?

A.      The person next to me was only wearing one glove.

Q.      Who's that?

A.      Don [Kearns].

Q.      Did Robert Crabb tell him to put on his glove?

A.      Yeah, very nicely.

Q.      Did Don comply?

A.      Yes.

Q.      Who else wasn't wearing gloves?

A.      Derek Spada.

Q.      Did Robert Crabb tell Derek Spada to put on his gloves?

A.      Yes.

Q.      Did Derek comply?

A.      Yes.

(Pl.'s App., Ex. 1 at 75-79.)

Hubbell's testimony, if believed, could enable a reasonable jury to conclude that she was

not insubordinate, thereby casting doubt on World Kitchen's explanation for suspending her.  A

reasonable jury could also conclude, based on Hubbell's testimony, that she was treated more

44

harshly than two male employees who had also failed to wear gloves on both hands while working.[11]  That is sufficient to defeat World Kitchen's motion for summary judgment.  *Reeves*, 530 U.S. at 147 ("Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision.").  Furthermore, at a later point in her deposition, Hubbell identified a separate instance in which two female employees were disciplined for not wearing gloves while a male employee was not disciplined for similar conduct.  (Pl.'s App., Ex. 1 at 80.)  This testimony, if believed, could constitute evidence of sex discrimination.

In her testimony, Hubbell referred to a surveillance tape depicting the incident in question.  (Pl.'s App., Ex. 1 at 76.)  In his June 1, 2006, email to Good, Crabb referred to this same tape when describing Hubbell's conduct as insubordinate.  (App. in Supp. of USW entities' Mot. for Summ. J., Ex. G28.)  In his declaration, Watt stated that his viewing of the tape had led him to believe that the grievance concerning Hubbell's suspension was lacking in merit.  (App. in Supp. of USW entities' Mot. for Summ. J., Ex. A ¶ 43.)  It is clear that the parties disagree not only about what transpired on June 1, 2006, but also about what the surveillance tape reveals.  The Supreme Court made clear that a court entertaining a motion for summary judgment can consider visual depictions contained in a videotape in determining whether a party is entitled to a judgment as a matter of law.  *Scott v. Harris*, 550 U.S. 372, 378-381 (2007).  The parties in this case, however, did not submit the surveillance tape itself for consideration, leaving the court with

---

[11]The court notes that Hubbell described only one encounter with Crabb, whereas Crabb described two separate encounters with Hubbell.  Hubbell's testimony contradicts that of Crabb in that Hubbell did not acknowledge that Crabb had returned to tell her a second time that she needed to wear two gloves while working.

only the differing accounts of the incident contained in the record.  Based upon the record before

the court, there is a genuine issue of material fact about whether Hubbell was insubordinate,

thereby creating a genuine issue of material fact as to whether the *real reason* for her suspension

was sex discrimination.  *See Furnco Constr. Corp.*, 438 U.S. at 577.  World Kitchen's motion for

summary judgment will be denied with respect to Hubbell's sex-based discrimination claims

under Title VII and the PHRA stemming from her June 2006 suspension.  To the extent that

Hubbell asserts race- and age-based discrimination claims under Title VII, the ADEA and the

PHRA concerning the suspension, summary judgment will be entered in favor of World Kitchen.

**B.      The Discrimination Claims Against the USW Entities**

**1.      General Framework**

Title VII contains a provision declaring it to be an "unlawful employment practice" for a

"labor organization" "to exclude or to expel from its membership, or otherwise to discriminate

against, any individual because of his [or her] race, color, religion, sex, or national origin . . . ."

42 U.S.C. § 2000e-2(c)(1).  The ADEA declares it to be "unlawful" for a "labor organization"

"to exclude or to expel from its membership, or otherwise to discriminate against, any individual

because of his [or her] age . . . ." 29 U.S.C. § 623(c)(1).  The PHRA contains a provision

declaring it to be an "unlawful discriminatory practice" "[f]or any labor organization because of

the race . . . age, [or] sex . . . of any individual to deny full and equal membership rights to any

individual or otherwise to discriminate against such individuals with respect to hire, tenure,

terms, conditions or privileges of employment or any other matter, directly or indirectly, related

to employment."  43 Pa. Cons. Stat. § 955(c).  The Pennsylvania courts generally interpret the

provisions of the PHRA to be coterminous with their federal counterparts. *Stultz v. Reese*

*Brothers, Inc.*, 835 A.2d 754, 759 (Pa. Super. Ct. 2003).

A labor organization is subject to liability under these statutory provisions if it engages in discrimination based on an impermissible discriminatory criterion. *14 Penn Plaza, LLC v. Pyett*, 129 S.Ct. 1456, 1473 (2009). Such *discrimination* can take different forms. By the plain language of the statutory provisions, a labor organization "discriminates" on the basis of race, sex or age when it "excludes" or "expels" from its membership individuals who share a statutorily-protected trait. 42 U.S.C. § 2000e-2(c)(1); 29 U.S.C. § 623(c)(1). A plaintiff attempting to hold a labor organization liable for discrimination, however, is not always required to make a showing of class-based animus. In *Goodman v. Lukens Steel Co.*, 482 U.S. 656 (1987), the Supreme Court held that a labor organization violates Title VII when it deliberately avoids processing grievances brought by the members of a statutorily-protected class because it wishes to avoid alienating an employer. Referring to Title VII and 42 U.S.C. § 1981, the Supreme Court explained:

> Those provisions do not permit a union to refuse to file any and all grievances presented by a black person on the ground that the employer looks with disfavor on and resents such grievances. It is no less violative of these laws for a union to pursue a policy of rejecting disparate-treatment grievances presented by blacks solely because the claims assert racial bias and would be very troublesome to process.

*Goodman*, 482 U.S. at 669. Consequently, a labor organization cannot lawfully categorize discrimination claims brought by members of a statutorily-protected class as "unworthy of pursuit."[12] *Id.* A labor organization which does so subjects itself to liability even if it does not

---

[12]The United States Court of Appeals for the Seventh Circuit recognized in *EEOC v. Pipefitters Ass'n Local Union 597*, 334 F.3d 656, 661 (7th Cir. 2003), that the Supreme Court's holding in *Goodman v. Lukens Steel Co.*, 482 U.S. 656 (1987), does not preclude a labor organization from adopting "a policy of not assisting workers who complain about racial or sexual harassment, whether they are white or black, male or female." Under *Goodman*, a labor organization runs afoul of Title VII when it categorically rejects discrimination claims brought by members of

act pursuant to a class-based animus.  *Pipefitters Ass'n Local Union 597*, 334 F.3d at 661.

Discrimination claims against labor organizations involving no "direct evidence" of discrimination are analyzed under the *McDonnell Douglas* burden-shifting framework.  *See Perez v. United Air Lines, Inc.*, 362 F. Supp. 2d 1230, 1240 (D. Colo. 2005).  In order to establish a prima facie case of discrimination against the USW entities, Hubbell must show that: (1) World Kitchen violated the applicable collective bargaining agreement in a manner which adversely affected her; (2) the USW entities violated their "duty of fair representation" by permitting the violation to go unremedied; and (3) the actions or inactions of the USW entities occurred under circumstances giving rise to an inference of discrimination based on an impermissible criterion.  *Tillman v. Pepsi Bottling Group, Inc.*, 538 F. Supp. 2d 754, 770 (D. Del. 2008).  Hubbell contends that the USW entities discriminated against her by failing to file grievances in response to her complaints about Crabb, by declining to proceed further with the grievance process in connection with the written warnings that she received on October 30, 2005,

---

a *particular* class, not when it *indiscriminately* rejects discrimination claims brought by members of all classes. *Pipefitters Ass'n Local Union 597*, 334 F.3d at 661 (observing that a categorical decision by a labor organization not to pursue *any* discrimination claims, regardless of whether the complainants are "white or black, male or female," would require a court to take the Title VII analysis "a step beyond *Goodman*").  Referring to *Goodman* in *Pipefitters Ass'n Local Union 597*, the court of appeals explained:

> It was an easy case, because it has never been a defense to a charge of discrimination that the discriminator was not actuated by racist or other invidious motives, but may just have been trying to maximize his profits, pursuant to the maxim that the only color that interests a businessman is green.  It is not a defense for a shopkeeper who refuses to hire blacks that the only reason he does so is that his customers don't like blacks.

*Pipefitters Ass'n Local Union 597*, 334 F.3d at 661.  *Goodman* did not clarify whether, and under what circumstances, a labor organization could be liable under Title VII for choosing to ignore *all* discrimination claims brought by members of *all* classes.

and by abandoning the grievance process in relation to her June 2006 suspension.[13]  (Pl.'s Br. in

Opp. To Defs.' Mot. for Summ. J. at 21-24.)

> **2.      Claims Related to the Failure to Pursue Grievances Concerning Crabb's Treatment of Hubbell**

Although Hubbell generally complains that USW Local 53 and USW International

neglected to pursue grievances related to Crabb's treatment of her in the workplace, she fails to

explain why she believes that the collective bargaining agreement was violated.  (Pl.'s Br. in

Opp. To Defs.' Mot. for Summ. J. at 22-23.)  The court notes that the collective bargaining

agreement in effect during the relevant period of time contained a provision prohibiting

"discrimination between employees or applicants for employment for reasons of race, creed, sex,

color, age, national origin, marital status or non-job related disability."  (World Kitchen's App.,

Ex. A-14 at 41.)  The parties do not advise whether this contractual provision provided broader

protection to World Kitchen employees than that afforded to employees under Title VII, the

ADEA and the PHRA.  The collective bargaining agreement expressly required both World

Kitchen and the USW entities to comply with all relevant federal and state antidiscrimination

statutes.  (*Id.*)  This court already concluded that the evidence in this case, when viewed in the

light most favorable to Hubbell, does not establish that Crabb's "harassment" of Hubbell

constituted a violation of Title VII, the ADEA or the PHRA.  In his declaration, Clark stated that

he did not view Crabb's harsh treatment of World Kitchen employees as a violation of the

collective bargaining agreement.  (App. in Supp. of USW entities' Mot. for Summ. J., Ex. C ¶ 3.)

Hubbell points to nothing in the record which indicates that Clark's assessment was incorrect.

---

[13]The court understands Hubbell's claims concerning the dissemination and posting of her letter to Clark to be retaliation claims rather than class-based discrimination claims.

Even if the court were to assume that Crabb's conduct in relation to Hubbell had constituted a violation of the collective bargaining agreement's nondiscrimination provision, Hubbell would not be able to hold the USW entities liable under the relevant antidiscrimination statutes without showing that the entities *themselves* engaged in discrimination.  *Anjelino v. N.Y. Times Co.*, 200 F.3d 73, 95 (3d Cir. 1999) ("While a union may be held liable under Title VII, the record here does not demonstrate that the Union *itself* instigated or actively supported the discriminatory acts allegedly experienced by the appellants.").  Hubbell must show, at a minimum, that a USW official decided not to pursue a grievance *for discriminatory reasons*.  *See Ellison v. Plumbers & Steam Fitters Union Local 375*, 118 P.3d 1070, 1075-76 (Alaska 2005).  In her deposition, Hubbell expressly acknowledged that the relevant USW officials did not discriminate against her because of her race or age.  (Pl.'s App., Ex. 2 at 294; Pl.'s App., Ex. 3 at 342-43.)  The court understands her discrimination claims against the USW entities to be sex-based discrimination claims under Title VII and the PHRA.  Hubbell expressed a general "feeling," or a subjective "belief," that Gladys and Clark declined to pursue grievances on her behalf because she was a woman.  (Pl.'s App., Ex. 3 at 340, 343.)  When asked why she believed that Watt engaged in sex-based discrimination by asking her what she deemed to be inappropriate questions, Hubbell replied, "I don't know."  (Pl.'s App., Ex. 2 at 302.)  When pressed to specify how Cahill engaged in sex-based discrimination, Hubbell simply stated that she had not been "represented as zealously as the men" working at the Charleroi plant.  (Pl.'s App., Ex. 2 at 312.)

A plaintiff cannot create an inference of discrimination simply by expressing a "subjective belief" that an impermissible criterion has impacted a labor organization's decision not to pursue a grievance.  *Wilson v. Blockbuster, Inc.*, 571 F. Supp. 2d 641, 647 (E.D. Pa. 2008).

Hubbell's claims against the USW entities concerning their reaction to Crabb's behavior are unsupported by evidence of sex-based discrimination. This deficiency in Hubbell's claims is illustrated by the following excerpt from the transcript of her deposition:

> Q. Is it your claim in this case that Mr. Gladys did not file a grievance against Mr. Crabb in order to discriminate against you because you're a woman?
>
> A. I believe exactly that.
>
> Q. What leads you to believe that Mr. Gladys didn't file that particular grievance because you are a woman?
>
> A. Because it's the good ole' boys club there, and you'll hear that many times in the plant.
>
> Q. I'm asking you what you base your claim on that Mr. Gladys didn't file this grievance because you are a woman?
>
> A. Because that is what I feel.
>
> Q. You feel that he's part of a good ole' boys club?
>
> A. Yes, that is exactly what I feel.
>
> Q. What do you base that feeling on?
>
> A. I don't base that feeling on anything. That is my feeling, and I can't -- I can't give you any more than that.

(Pl.'s App., Ex. 3 at 339-40.) As Hubbell's testimony demonstrates, her claims against the USW entities regarding their unwillingness to pursue grievances related to Crabb's behavior are based on pure speculation that USW officials were discriminating against Hubbell because of her sex. A finding of discrimination, however, must "turn on evidence," not merely on a plaintiff's unsupported assertions. *Pryor v. NCAA*, 288 F.3d 548, 566 (3d Cir. 2002). Because Hubbell presents no evidence permitting a reasonable inference of sex discrimination to be drawn in

connection with the actions (or inactions) of the USW entities in response to her complaints

about Crabb, she cannot establish a prima facie case of sex discrimination.  Hubbell implicitly

concedes that the USW entities did not discriminate against her because of her race or age.

Therefore, the USW entities are entitled to summary judgment with respect to the Title VII,

ADEA and PHRA claims stemming from their decision not to file grievances related to Crabb's

alleged harassment of Hubbell.

> ###          3.          Claims Related to the Failure to Pursue Grievances Concerning the
> ###                      Written Warnings of October 30, 2005

Hubbell also contends that the USW entities engaged in sex-based discrimination when

they abandoned the grievance process in connection with the written warnings that she received

on October 30, 2005.  As an initial matter, Hubbell challenges the authenticity of a letter alleged

to have been sent by Gladys to Good shortly after the issuance of the warnings.  In support of

their motion for summary judgment, the USW entities submitted a copy of a letter from Gladys

to Good which read in part:

> After reviewing plant rule violation #5 and plant rule violation # 9 the
> Local Union and the International Union would like to expedite this
> grievance to the fifth step to further investigate these charges against
> Janice Hubbell and for a final resolution.

(App. in Supp. of USW entities' Mot. for Summ. J., Ex. G20.)  The document, which is typed,

contains no typewritten date.  *Id.*  It, however, contains a handwritten notation reading, "on or

about 11-1-05."  (*Id.*)  Hubbell asks the court to infer from the lack of a typewritten date that the

document was retroactively constructed in order to create a paper trail that was favorable to the

USW entities.  (Pl.'s Br. in Opp. To Defs.' Mot. for Summ. J. at 24.)  Such an inference,

however, cannot be drawn because there is another document contained in the record which

demonstrates that the letter was sent during the timeframe referenced by the USW entities.  The

USW entities presented a copy of a letter from Good to Gladys, which read in pertinent part:

> I have reviewed your request to expedite this grievance to the fifth
> step and believe that it is in the best interest of all parties to make an
> exception and resolve this matter.   Your request to move this
> grievance to Step 5 is granted.
>
> The grievance is denied and the company maintains the position that
> the discipline was justified.

(App. in Supp. of USW entities' Mot. for Summ. J., Ex. G21.)  This document contains a

typewritten date of November 4, 2005.  (*Id.*)  It also lists November 2, 2005, as the date on which

a grievance was filed on behalf of Hubbell.  (*Id.*)  Good's response to Gladys' message makes

sense only if he actually received that message prior to sending his response.  Since Hubbell does

not question the authenticity of the response, the court has no reason to doubt the authenticity of

the letter that triggered it.

Hubbell claims that she was never told that the grievance process commenced during the

fall of 2005.  (Pl.'s Br. in Opp. To Defs.' Mot. for Summ. J. at 24.)  Specifically, she asserts that

she did not receive Watt's letter of September 13, 2006, concerning the written warnings.  (*Id.*)

Hubbell failed, however, to point to evidence which supports her subjective belief that the

grievance process was never initiated.

The record is replete with evidence that Watt pursued the grievance.  Hubbell

acknowledged in her deposition that she met with Watt and Breeden to discuss the allegations

which were lodged against her.  (Pl.'s App., Ex. 3 at 392-94.)  In his declaration, Watt stated that

he was unable to focus on the grievance process during the summer of 2006 because of

protracted negotiations involving a new collective bargaining agreement.  (App. in Supp. of

53

USW entities' Mot. for Summ. J., Ex. A ¶ 28.)  The record reflects that Watt resumed work on Hubbell's grievance in September 2006.  (*Id.*)  In a letter to Nimesheim dated September 13, 2006, Watt opined that the written warning based on Hubbell's alleged harassment of other employees was issued "for just cause."  (App. in Supp. of USW entities' Mot. for Summ. J., Ex. G25.)  In that same letter, Watt stated that the written warning based on Hubbell's alleged selection and packaging of bad products, reading while on duty, and excessive talking with co-workers was unjustified.  (*Id.*)  Nimesheim responded on September 21, 2006, with an email message requesting that Watt and Cahill view a surveillance tape depicting Hubbell reading while on duty.  (App. in Supp. of USW entities' Mot. for Summ. J., Ex. G26.)  Watt explained in his declaration that, after viewing the tape, he had concluded that Hubbell had been reading while on duty, and that the grievance was lacking in merit.  (App. in Supp. of USW entities' Mot. for Summ. J., Ex. A ¶ 32.)  Notwithstanding Hubbell's dissatisfaction with the ultimate outcome of the grievance process, she cannot show that the process was never pursued.

The USW entities, of course, can still be held liable if their decision to abandon the grievance process was tainted by a discriminatory motive.  A labor organization is not legally required to pursue an employee's grievance where it is convinced that no logical basis for doing so exists, or where further pursuit of the grievance would needlessly deplete its resources and undermine its credibility.  *York v. AT&T Co.*, 95 F.3d 948, 956 (10th Cir. 1996).  Hubbell did not point to any evidence in the record which would indicate that World Kitchen issued the written warnings because of her race, sex or age.  Indeed, the court understands her underlying claims concerning the written warnings to be based primarily on the antiretaliation provisions of Title VII, the ADEA and the PHRA, rather than on the antidiscrimination provisions of those statutes.

(*See* Pl.'s Br. in Opp. To Defs.' Mot. for Summ. J. at 25.)  No reasonable jury could infer that World Kitchen issued the written warnings because of Hubbell's statutorily-protected traits. Given that the record is devoid of evidence that USW officials were biased against Hubbell because of those traits, it follows *a fortiori* that no reasonable trier of fact could conclude that Watt's decision to abandon the grievance process was tainted by either a discriminatory animus or a desire to avoid the pursuit of discrimination-based grievances brought by members of a statutorily-protected group.  Since Hubbell cannot establish the third element of a prima facie case of discrimination (against either World Kitchen or the USW entities) with respect to the written warnings, the USW entities are entitled to summary judgment with respect to all class-based discrimination claims asserted by Hubbell arising from the USW entities' decision not to continue the grievance process in connection with those warnings.[14]

### 4.   Claims Related to the Failure to Pursue Grievances Concerning the June 2006 Suspension

Hubbell also contends that the USW entities discriminated against her by failing to timely

---

[14]Watt's reason for ultimately abandoning the grievance process in connection with the written warning concerning Hubbell's performance at work was his viewing of a surveillance tape depicting Hubbell reading while on duty.  (App. in Supp. of USW entities' Mot. for Summ. J., Ex. A ¶ 32.)  The USW entities could have submitted the tape itself for the court's consideration at the summary judgment stage.  *See Scott*, 550 U.S. at 378-81.  This court already concluded that there is a genuine issue of material fact about whether Hubbell was insubordinate on June 1, 2006, since the parties have presented differing accounts of that event without producing the tape depicting it.  The absence of the tape allegedly showing Hubbell reading at her work station does not preclude the entry of summary judgment in favor of the USW entities with respect to Watt's decision to abandon the grievance process because Hubbell cannot establish a prima facie case of discrimination in relation to that decision.  The burden of production does not shift to the defendant in this situation unless the plaintiff is able to establish a prima facie case of discrimination.  *Burdine*, 450 U.S. at 253-55.  It is undisputed that at least one male employee *was not* suspended for failing to wear gloves on both hands on June 1, 2006, and that Hubbell *was* suspended (at least in part) for a similar infraction.  This difference in treatment is sufficient to shift the burden of production to World Kitchen to articulate a legitimate, nondiscriminatory reason for suspending Hubbell.  *See Lightner*, 545 F.3d at 264-65. Because Hubbell cannot establish a prima facie case of discrimination with respect to the written warnings, further inquiry into Watt's reasons for abandoning the grievance process is not necessary.  The court acknowledges that evidence typically considered at the pretext stage of the analysis can also be considered at the *prima facie* stage. *C.A.R.S. Protection Plus, Inc.*, 527 F.3d at 370.  In this instance, however, there is simply no evidence that USW officials were influenced by Hubbell's race, sex or age when they decided not to proceed with the grievance process.

initiate the grievance process in relation to her June 2006 suspension.  (Pl.'s Br. in Opp. To

Defs.' Mot. for Summ. J. at 24.)  As noted earlier, the circumstances of that suspension are

sufficient to permit an inference of sex-based discrimination (but not race- or age-based

discrimination) to be drawn, given that no disciplinary action was taken against Kearns.

*Lightner*, 545 F.3d at 264-65.  Because the underlying claim supporting Hubbell's grievance is

buttressed by a reasonable inference of sex-based discrimination on the part of World Kitchen, a

reasonable trier of fact could infer from Watt's inaction that he may have declined to proceed

with the grievance process because it was based on an underlying claim of discrimination.

*Romero v. Union Pac. R.R.*, 615 F.2d 1303, 1311 (10th Cir. 1980) ("A union cannot acquiesce in

a company's prohibited employment discrimination and expect to evade Title VII liability for

such discrimination.").  Such an inference is sufficient to shift the burden of production to the

USW entities to articulate a legitimate, nondiscriminatory reason for not contesting the

suspension further.  *Burdine*, 450 U.S. at 253 ("The burden of establishing a prima facie case of

disparate treatment is not onerous.").

     In his declaration, Watt stated that he had decided not to proceed with the grievance

process concerning Hubbell's suspension after viewing the surveillance tape depicting her

alleged insubordination.  (App. in Supp. of USW entities' Mot. for Summ. J., Ex. A ¶ 43.)  At

her deposition, however, Hubbell appeared to be confident that the tape would vindicate her

contention that she was *not* insubordinate.  (Pl.'s App., Ex. 1 at 76.)  Had the tape itself been

submitted by the parties, it could have been considered for summary judgment purposes.  *Scott*,

550 U.S. at 378-80.  Since the tape is not a part of the record, however, the court is left to

consider only the conflicting accounts of its contents presented by the parties.  Given that Watt's

reason for abandoning the grievance process (i.e., Hubbell's insubordination) is subject to

dispute, Hubbell's sex-based discrimination claims concerning the USW entities' treatment of

her suspension are not amenable to resolution at the summary judgment stage.  Accordingly,

insofar as the suspension is concerned, the USW entities' motion for summary judgment will be

granted with respect to Hubbell's race- and age-based discrimination claims and denied with

respect to her sex-based discrimination claims.

## C.    The Retaliation Claims

### 1.    General Framework

Hubbell contends that the written warnings that she received on October 30, 2005, were

in violation of the antiretaliation provisions of Title VII, the ADEA and the PHRA.  Title VII's

antiretaliation provision is codified at 42 U.S.C. § 2000e-3(a), which provides:

> **§ 2000e-3.  Other unlawful employment practices**
>
> **(a) Discrimination for making charges, testifying, assisting, or participating in enforcement proceedings.**  It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this title [42 U.S.C. §§ 2000e to 2000e-17], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title [42 U.S.C. §§ 2000e to 2000e-17].

42 U.S.C. § 2000e-3(a).  The first clause of § 2000e-3(a) is known as the "opposition clause,"

while the second clause of this statute is known as the "participation clause."  *Crawford v. Metro.*

*Gov't of Nashville*, 129 S. Ct. 846, 850 (2009).  In the absence of "direct evidence" of retaliation,

a retaliation case is considered in accordance with the *McDonnell Douglas* burden-shifting

framework. *Fasold v. Justice*, 409 F.3d 178, 188 (3d Cir. 2005). In order to establish a prima

facie case of retaliation under Title VII, Hubbell must show that: (1) she engaged in statutorily-

protected conduct; (2) World Kitchen took a "materially adverse" action against her; and (3)

there was a causal connection between her protected conduct and World Kitchen's "materially

adverse" action. *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 231 (3d Cir.

2007).

　　　　With respect to the first element of her prima facie case, Hubbell must show that she

opposed conduct, or participated in an inquiry involving conduct, that she reasonably believed to

be in violation of Title VII. *See Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1085 (3d

Cir. 1996). It is not necessary for her to show that the underlying conduct of which she

complained had actually been violative of Title VII. *See Griffiths v. Cigna Corp.*, 988 F.2d 457,

468 (3d Cir. 1993). Hubbell, however, cannot sustain a retaliation claim by showing that she

opposed conduct, or participated in an inquiry involving conduct, that was obviously not

proscribed by Title VII. *See Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 271-72 (2001).

　　　　The second element of a retaliation claim centers on *Burlington Northern & Sante Fe

Railway Co. v. White*, 548 U.S. 53 (2006), in which the Supreme Court held that Title VII's

antiretaliation provision "does not confine the actions and harms it forbids to those that are

related to employment or occur at the workplace." *Burlington Northern*, 548 U.S. at 57. The

words "discriminate against" appearing within the text of the antiretaliation provision were

construed to prohibit a broad category of retaliatory actions taken by an employer. *Id.* at 61-63.

"Title VII's anti-retaliation provision does not merely prohibit an employer from discriminating

against an individual 'with respect to his [or her] compensation, terms, conditions, or privileges

of employment,' but instead sweeps broadly enough to prohibit other 'materially adverse' actions

taken in retaliation for activity protected under the statute." *Johnson v. McGraw-Hill Cos.*, 451

F. Supp. 2d 681, 710 (W.D. Pa. 2006) (quoting *Burlington Northern*, 548 U.S. at 60-62, 67-69).

A plaintiff pursuing a retaliation claim must show that the alleged retaliatory action "would have

been *materially* adverse to a reasonable employee or job applicant." *Burlington Northern*, 548

U.S. at 57 (emphasis added).  This standard has been formulated to "screen out trivial conduct

while effectively capturing those acts that are likely to dissuade employees from complaining or

assisting in complaints about discrimination." *Id.* at 70.  An action cannot be fairly characterized

as "materially adverse" if it would not have "'dissuaded an objectively reasonable worker from

making or supporting a charge of discrimination." *Id.* at 68 (quoting *Rochon v. Gonzales*, 438

F.3d 1211, 1219 (D.C. Cir. 2006)).

The ADEA's antiretaliation provision is codified at 29 U.S.C. § 623(d), which provides:

> **(d)  Opposition to unlawful practices; participation in investigations, proceedings, or litigation.**  It shall be unlawful for an employer to discriminate against any of his employees or applicants for employment, for an employment agency to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because such individual, member or applicant for membership has opposed any practice made unlawful by this section, or because such individual, member or applicant for membership has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter.

29 U.S.C. § 623(d).  The language contained in § 623(d) is not materially different from that

contained in § 2000e-3(a).  "It is an elementary principle of statutory construction that similar

language in similar statutes should be interpreted similarly." *United States v. Sioux*, 362 F.3d

1241, 1246 (9th Cir. 2004).  Consequently, courts have construed the protection afforded to

employees under the ADEA's antiretaliation provision to be coextensive with that afforded to

employees under Title VII's antiretaliation provision.  *Kessler v. Westchester County Dept. of*

*Soc. Servs.*, 461 F.3d 199, 205 (2d Cir. 2006); *Reyes Guadalupe v. Casus Criollas*, 597 F. Supp.

2d 255, 261 (D.P.R. 2008); *Johnson*, 451 F. Supp. 2d at 710.

　　　　The PHRA declares it to be an "unlawful discriminatory practice" "[f]or any person,

employer, employment agency or labor organization to discriminate in any manner against any

individual because such individual has opposed any practice forbidden [thereunder], or because

such individual has made a charge, testified or assisted, in any manner, in any investigation,

proceeding or hearing [thereunder]."  43 PA. CONS. STAT. § 955(d).  The statutory language

contained in the PHRA's antiretaliation provision is similar to that contained in the

antiretaliation provisions of Title VII and the ADEA in that it proscribes *discrimination against*

an individual who *in any manner* opposes an unlawful discriminatory practice, or who *in any*

*manner* assists in an inquiry concerning an alleged unlawful discriminatory practice.  Because the

Pennsylvania courts have given no indication that the PHRA's antiretaliation provision should be

construed differently than its federal counterparts, federal courts generally construe that provision

to be coterminous with the antiretaliation provisions contained in Title VII and the ADEA.

*Mascioli v. Arby's Rest. Group, Inc.*, 610 F. Supp. 2d 419, 447 n.9 (W.D. Pa. 2009); *Johnson v.*

*Cmty. Coll. of Allegheny County*, 566 F. Supp. 2d 405, 442 n.13 (W.D. Pa. 2008); *Mathias v.*

*Allegheny Valley Sch.*, 560 F. Supp. 2d 354, 359 (E.D. Pa. 2008); *McGlone v. Allegheny Valley*

*Sch.*, 556 F. Supp. 2d 498, 503 (E.D. Pa. 2008).

　　　　**2.**　　　　**The Retaliation Claims Against World Kitchen**

Hubbell argues that World Kitchen violated the antiretaliation provisions of Title VII, the ADEA and the PHRA by issuing the written warnings of October 30, 2005, in response to her criminal complaint against Crabb.  (Pl.'s Br. in Opp. To Defs.' Mot. for Summ. J. at 25.)  On October 28, 2005, Hubbell went to a police station operated by the Charleroi Police Department and reported that Crabb had been "harassing" her.  (Pl.'s App., Ex. 10.)  She was told that Crabb's treatment of her was a "civil matter," and that she should retain the services of a private attorney if she wanted to seek redress.  (*Id.*)  The written warnings were issued two days after the filing of the criminal complaint.  (App. in Supp. of USW entities' Mot. for Summ. J., Exs. G18 & G19.)  Hubbell testified that World Kitchen's issuance of the written warnings was "total retaliation" for her earlier filing of the police report.  (Pl.'s App., Ex. 1 at 143.)

World Kitchen moves for summary judgment on the ground that the filing of a generic "harassment" complaint with law enforcement authorities does not constitute protected activity for purposes of the applicable antiretaliation provisions.  (World Kitchen's Mem. in Supp. of Mot. for Summ. J. at 22 n.10.)  Alternatively, World Kitchen argues that Hubbell cannot establish the third element of a prima facie retaliation claims (i.e., a causal relationship between the criminal complaint and the written warnings) because no World Kitchen official was aware of the filing of the criminal complaint at the time that the written warnings were issued.  (World Kitchen's Reply in Supp. of Mot. for Summ. J. at 12-13.)  For purposes of this analysis, the court will assume *arguendo* that, under World Kitchen's progressive discipline system, the issuance of a written warning might dissuade an objectively reasonable employee from making or supporting

a charge of illegal discrimination.[15]  *See Burlington Northern*, 548 U.S. at 67-68.

Unlike Title VII, the ADEA and the PHRA, which prohibit only class-based harassment that is sufficiently severe or pervasive to create an objectively "hostile" or "abusive" work environment, Pennsylvania's criminal harassment statute proscribes a broad array of conduct intended to "harass, annoy or alarm another."[16]  18 PA. CONS. STAT. § 2709(a).  Pennsylvania's criminal statute defines "harassment" in a general manner rather than by reference to traits such as race, sex and age.  *See Id.*  Since Title VII, the ADEA and the PHRA are anti*discrimination* statutes, one cannot engage in activity protected under the opposition clauses of the corresponding antiretaliation provisions without "opposing" some form of *discrimination*.  A generalized complaint about "harassment," without reference to harassment based on a statutorily-enumerated criterion such as race, sex or age, does not constitute activity entitled to

---

[15]In his deposition, Good testified that Hubbell would not have been suspended in June 2006 had the written warnings of October 30, 2005, not been in her record.  (Pl.'s App., Ex. 5 at 103-04.)  He explained that the written warnings would not have impacted Hubbell, and would have been removed from her record, provided she was not subject to further disciplinary action for a period of one year.  (*Id.*)

[16]Pennsylvania's criminal "harassment" statute provides:

**§ 2709.  Harassment**

**(a) Offense defined.**--A person commits the crime of harassment when, with intent to harass, annoy or alarm another, the person:
(1) strikes, shoves, kicks or otherwise subjects the other person to physical contact, or attempts or threatens to do the same;
(2) follows the other person in or about a public place or places;
(3) engages in a course of conduct or repeatedly commits acts which serve no legitimate purpose;
(4) communicates to or about such other person any lewd, lascivious, threatening or obscene words, language, drawings or caricatures;
(5) communicates repeatedly in an anonymous manner;
(6) communicates repeatedly at extremely inconvenient hours; or
(7) communicates repeatedly in a manner other than specified in paragraphs (4), (5) and (6).

18 PA. CONS. STAT. § 2709(a).

protection under the opposition clauses contained in Title VII, the ADEA and the PHRA.  *Barber*

*v. CSX Distr. Servs.*, 68 F.3d 694, 701-02 (3d Cir. 1995).  There is no indication in the record

that the police report filed by Hubbell contained any allegation of class-based harassment.  (Pl.'s

App., Ex. 10.)  Because no reasonable person would have believed a criminal complaint

concerning generalized harassment to be protected under the opposition clauses found in the

applicable anti*discrimination* statutes, Hubbell's filing of a criminal complaint against Crabb did

not constitute protected activity under Title VII, the ADEA and the PHRA.  *Moore v. City of*

*Phila.*, 461 F.3d 331, 341 (3d Cir. 2006) ("Whether the employee opposes, or participates in a

proceeding against, the employer's activity, the employee must hold an objectively reasonable

belief, in good faith, that the activity they oppose is unlawful *under Title VII*." (emphasis

added)).

       The court acknowledges that, in some instances, the filing of a criminal complaint can

constitute protected conduct under the antiretaliation provisions presently at issue.  If there is a

nexus between the relevant criminal act and the victim's statutorily-protected status, the

antiretaliation provisions may be implicated.  For instance, where a male supervisor touches the

breast of a female employee in a sexually suggestive manner, the filing of a criminal complaint

alleging sexual assault or battery constitutes activity protected under Title VII's opposition

clause.  *See Worth v. Tyer*, 276 F.3d 249, 265 (7th Cir. 2001); *DeWitt v. Lieberman*, 48 F. Supp.

2d 280, 292-293 (S.D.N.Y. 1999).  In that situation, the conduct "opposed" (i.e., a sexual assault)

can constitute *both* a violation of a state criminal statute *and* a violation of Title VII.  *See Brock*

*v. United States*, 64 F.3d 1421, 1423 (9th Cir. 1995).  In the instant case, there is no logical

connection between Hubbell's criminal complaint and a form of "discrimination" prohibited

63

under Title VII, the ADEA or the PHRA.

Even if the filing of the criminal complaint here were protected under the relevant opposition clauses, a causal relationship between a protected activity and the alleged act of retaliation cannot be inferred in the absence of evidence that the employer was aware of the protected activity. *Weston v. Pennsylvania*, 251 F.3d 420, 431 n.6 (3d Cir. 2001). Hubbell did not introduce evidence to show that Crabb, or any other World Kitchen official, was aware of the filing of the criminal complaint as of October 30, 2005. Crabb testified in his deposition that he was not contacted by the Charleroi Police Department about the matter, and that he learned of the filing only by means of a rumor. (Pl.'s App., Ex. 4 at 56-57.) Hubbell testified that "everybody" knew about the criminal complaint because she filed it in order to prevent her husband from directly confronting Crabb. (Pl.'s App., Ex. 1 at 43.) There is, however, no evidence of record that Crabb (or any other World Kitchen official) knew about the filing of the criminal complaint in the short interval of time (i.e., two days) between that filing and the issuance of the written warnings.

Hubbell appears to draw an inference of retaliation from the fact that the written warnings, which were issued a mere two days after the filing of her criminal complaint against Crabb, were not issued immediately after the relevant infractions occurred. (Pl.'s App., Ex. 1 at 143.) This inference is unwarranted. It is undisputed that World Kitchen's investigation into Hubbell's conduct continued through September and October 2005. (Pl.'s App., Ex. 6 at 70.) Hubbell participated in two interviews related to the investigation, the second of which was not conducted until October 18, 2005. (App. in Supp. of USW entities' Mot. for Summ. J., Ex. G17 at WKI0521-WKI0525.) It was during that second interview that Hubbell acknowledged that she

had authored the letter referring to her African-American co-workers as "substance abusers."  (*Id.* at WKI0521)  The written warnings were issued shortly after the completion of World Kitchen's investigation.  Under these circumstances, no reasonable jury could infer that World Kitchen's issuance of the written warnings weeks following the underlying conduct in issue was in retaliation for the filing of the criminal complaint.  *Kachmar*, 109 F.3d at 178 ("It is important to emphasize that it is causation, not temporal proximity itself, that is an element of plaintiff's prima facie case, and temporal proximity merely provides an evidentiary basis from which an inference can be drawn.").

    As an alternative basis for her retaliation claims against World Kitchen, Hubbell contends that she engaged in protected activity when she gave her handwritten letter to Clark.  (Pl.'s Br. in Opp. To Defs.' Mot. for Summ. J. at 25.)  In order for a letter authored by an employee to constitute activity protected under the opposition clauses of Title VII, the ADEA and the PHRA, "it must be possible to discern from the context of the [letter] that the employee opposes an unlawful employment practice."  *Curay-Cramer v. Ursuline Acad. of Wilmington*, 450 F.3d 130, 135 (3d Cir. 2006).  In her letter, Hubbell intimated that black employees received more favorable treatment than white employees because World Kitchen feared that black employees would seek assistance from the NAACP if their demands were not met.  (App. to World Kitchen's Resp. to Pl.'s Additional Factual Statements, Ex. A-2 at JH555-JH556.)  She also expressed the view that "everyone should be treated the same regardless of age, sex, race, nationality, etc."  (*Id.* at JH557.)  Statements by an employee communicating a belief that his or her employer engaged in race-based discrimination are protected under Title VII's opposition clause.  *Crawford*, 129 S.Ct. at 851.  With respect to the written warning concerning Hubbell's

alleged "harassment" of other employees, causation is not in dispute, since the finding of

"harassment" was based primarily (if not exclusively) on the letter itself.

It does not follow, however, that Hubbell was immune from discipline for the statements

contained in her letter. Courts have identified an important distinction between the participation

clause and the opposition clause contained in Title VII's antiretaliation provision. Because the

participation clause proscribes discrimination against an employee "because he [or she] has made

a charge, testified, assisted, or participated *in any manner* in an investigation, proceeding or

hearing *under* [Title VII]," 42 U.S.C. § 2000e-3(a) (emphasis added), courts have recognized that

it "is expansive and seemingly contains no limitations." *Deravin v. Kerik*, 335 F.3d 195, 203 (2d

Cir. 2003). The participation clause provides broader protection to employees than does the

opposition clause. *Slagle v. County of Clarion*, 435 F.3d 262, 266 (3d Cir. 2006). The

opposition clause, which proscribes discrimination against an employee "because he [or she] has

opposed any practice made an unlawful employment practice by [Title VII]," 42 U.S.C. § 2000e-

3(a), serves "a more limited purpose" than that served by the participation clause. *See Sias v.

City Demonstration Agency*, 588 F.2d 692, 695 (9th Cir. 1978). While the protection afforded to

employees under the participation clause is broad enough to encompass statements that are

"malicious and defamatory," the protection afforded to employees under the opposition clause

does not extend to certain forms of "opposition" that have the effect of disrupting one's work

environment. *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1312 (6th Cir. 1989).

The pendency of an EEOC charge, and a resulting "investigation, proceeding, or hearing"

under Title VII, is a prerequisite to the application of the participation clause. *Abbott v. Crown

Motor Co.*, 348 F.3d 537, 543 (6th Cir. 2003). The unequal treatment referenced in Hubbell's

letter was not the subject of a pending "investigation," nor was it connected to a previously-filed

charge of discrimination.  Consequently, the only statutory protection available to Hubbell under

Title VII's antiretaliation provision is that provided under the opposition clause.  That clause

does not provide an employee with a license to "oppose" discrimination in a manner that is

"disruptive" or "disorderly."  *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 260 (4th

Cir. 1998).  Unlike the participation clause, which provides employees with protection that is

"exceptionally broad," *Pettway v. Am. Cast Iron Co.*, 411 F.2d 998, 1006 n.18 (5th Cir. 1969),

the opposition clause does not prevent an employer from imposing discipline on an employee

who, while "opposing" an "unlawful employment practice," takes it upon himself or herself to

defame other employees.  In *Gilooly v. Missouri Department of Health & Senior Services*, 421

F.3d 734 (8th Cir. 2005), the United States Court of Appeals for the Eighth Circuit explained:

> It cannot be the case that any employee who files a Title VII claim
> and is disbelieved by his or her employer can be legitimately fired.
> If such were the case, every employee could be deterred from filing
> their action and the purposes of Title VII in regards to sexual
> harassment would be defeated.  However, it also cannot be true that
> a plaintiff can file false charges, lie to an investigator, and possibly
> defame co-employees, without suffering repercussions simply
> because the investigation was about sexual harassment.  To do so
> would leave employers with no ability to fire employees for defaming
> other employees or the employer through their complaint when the
> allegations are without any basis in fact.

*Gilooly*, 421 F.3d at 740.  The court notes that, in this case, Hubbell was neither terminated nor

suspended for writing disparaging statements about her African-American co-workers.  Instead,

she received only a written *warning* indicating that this form of harassment would not be

tolerated.  (App. in Supp. of USW entities' Mot. for Summ. J., Ex. G18.)

During the interview conducted on October 18, 2005, Hubbell acknowledged that she

wrote the letter.  (App. in Supp. of USW entities' Mot. for Summ. J., Ex. G17 at WKI0521.)  In

her letter, Hubbell referred to some of her African-American co-workers as "lazy and clearly

incompetent" "substance abusers" who needed their paychecks "to support their habits."  (App.

to World Kitchen's Resp. to Pl.'s Additional Factual Statements, Ex. A-2 at JH554.)  She stated

that these employees were reluctant to strike for a better contract because they would never be

able to get jobs with other employers.  (*Id.*)  Hubbell asserted that while complaints filed by some

employees were routinely ignored, both World Kitchen and the USW entities would "bend over

backwards" to ensure that complaints filed by four black women were promptly handled.  (*Id.* at

JH555.)

It is undisputed that several employees were offended by Hubbell's statements.  During

an interview with World Kitchen officials, M. Bright stated that she had felt "humiliated" and

"belittled" by the contents of the letter.  (App. in Supp. of USW entities' Mot. for Summ. J., Ex.

G17 at WKI0490.)  L. Bright indicated that she wanted Hubbell to be terminated.  (*Id.* at

WKI0495.)  Reynolds opined that Hubbell created "a lot of havoc" in the workplace.  (*Id.* at

WKI0498.)  Rechichar declared that she had sought medical treatment in connection with the

"stress" caused by Hubbell's conduct.  (*Id.* at WKI0463.)  In light of the disparaging remarks

made by Hubbell in the letter, it is easy to understand why her co-workers were upset.

Under Pennsylvania law, "[a] statement which ascribes to another conduct, character, or a

condition which would adversely affect [his or] her fitness for the proper conduct of [his or] her

lawful business, trade or profession is defamatory."  *Walker v. Grand Cent. Sanitation, Inc.*, 634

A.2d 237, 243 (Pa. Super. Ct. 1993).  In her interview of October 18, 2005, Hubbell manifested a

belief that she had not acted improperly in making disparaging comments about her African-

American co-workers because she did not specifically mention their names in her letter.  (App. in

Supp. of USW entities' Mot. for Summ. J., Ex. G17 at WKI0522.)  A statement, however, can be

defamatory with respect to a particular individual even if he or she is not specifically identified

by name, provided that "[he or] she is pointed to by description or circumstances tending to

identify [him or] her." *Weinstein v. Bullick*, 827 F. Supp. 1193, 1199 (E.D. Pa. 1993).  As noted

earlier, Title VII's opposition clause does not immunize an employee from the consequences of

his or her defamatory statements simply because those statements are made in the context of an

abstract complaint about discrimination.  *Gilooly*, 421 F.3d at 740.  Hubbell would have the court

hold that World Kitchen was not permitted to issue a *warning* to her about the consequences of

her statements.  To do so would be tantamount to holding that an employer in World Kitchen's

position is powerless to prevent an employee from making disparaging comments of the kind

made by Hubbell in her letter.  Such a determination would run counter to the policies underlying

the antidiscrimination statutes at issue.  *See Stender v. Lucky Stores, Inc.*, No. C 88-1467 MHP,

1990 WL 192734, at *5 (N.D. Cal.. June 8, 1980) (observing that one of the antidiscrimination

statutes should be applied in a manner consistent with its policies).  The record contains no

evidence indicating that the statements in Hubbell's letter concerning her African-American co-

workers were true.  Hubbell was not prohibited from "opposing" discrimination in a more

respectful (or less disparaging) manner.  Under these circumstances, the antiretaliation provisions

contained in Title VII, the ADEA and the PHRA did not preclude World Kitchen from

disciplining Hubbell for making defamatory statements about her co-workers.

### 3.    The Retaliation Claims Against the USW Entities

Hubbell asserts retaliation claims against the USW entities for *disseminating* her letter to

other employees.  (Pl.'s Br. in Opp. To Defs.' Mot. for Summ. J. at 25.)  As noted earlier, it is

unclear who posted the letter on a bulletin board located on the production floor of the Charleroi

plant.  Hubbell gave three copies of the letter to Clark, instructing him to retain one copy for

himself and to give the other two copies to Gladys and Good.  (USW entities' facts ¶ 19.)  During

her interview on October 18, 2005, Hubbell stated that she prepared only five copies of the letter,

and that she retained the two copies that were not handed over to Clark.  (App. in Supp. of USW

entities' Mot. for Summ. J., Ex. G17 at WKI0523.)  She asserts that Clark, Gladys or Good must

have been responsible for leaking the contents of the letter to her co-workers.  Good, however,

testified in his deposition that he did not know who posted the letter.  (Pl.'s App., Ex. 5 at 80-

81.)  In their declarations, both Clark and Gladys stated that they did not make the letter available

to Hubbell's co-workers.  (App. in Supp. of USW entities' Mot. for Summ. J., Exs. B ¶ 6 & C ¶

4.)  Hubbell points to no evidence which contradicts the testimony of Good or the statements

made by Clark and Gladys.

The record is replete with evidence that Hubbell shared the contents of her letter with

other World Kitchen employees.  During the course of her interview, Hubbell told Nimesheim

that she had shown the letter to "a couple of people" in the Charleroi plant in order to solicit their

opinions.  (App. in Supp. of USW entities' Mot. for Summ. J., Ex. G17 at WKI0521.)  She stated

that her co-workers found the letter to be "accurate and to the point."  (*Id.* at WKI0522.)  On

October 9, 2005, Diana Hemmings ("Hemmings") informed Good that another World Kitchen

employee previously obtained a copy of the letter.  (*Id.* at WKI0475.)  Hemmings refused to

identify the employee.  (*Id.*)  During a separate interview, Crabb stated that he read Hubbell's

letter.  (*Id.* at WKI0482.)  M. Bright, who felt "humiliated" and "belittled" by the letter, told

70

Nimesheim that Hubbell was "passing the letter around" and "letting people read it." (*Id.* at WKI0490.) Reynolds indicated that Hubbell gave copies of the letter to other employees. (*Id.* at WKI0500.) Because Hubbell admittedly disseminated the letter *herself*, and given her failure to adduce evidence to contradict the statements and testimony provided by Clark, Gladys and Good, no reasonable jury could conclude that USW or World Kitchen officials were responsible for the eventual posting of the letter for viewing by Hubbell's co-workers. The motions for summary judgment filed by World Kitchen and the USW entities will be granted with respect to all Hubbell's retaliation claims under Title VII, the ADEA and the PHRA.

## V.    *Conclusion*

Having reviewed the record in considerable detail, the court concludes that a genuine issue of material fact exists about whether World Kitchen suspended Hubbell in June 2006 because of her sex, and whether the USW entities abandoned the grievance process in relation to that suspension because of Hubbell's sex. For this reason, the motions for summary judgment filed by World Kitchen and the USW entities will be denied with respect to Hubbell's sex-based discrimination claims under Title VII and the PHRA concerning the June 2006 suspension. The motions for summary judgment will be granted in all other respects. Specifically, the motions for summary judgment will be granted with respect to all Hubbell's race- and age-based discrimination claims, all her retaliation claims, and her sex-based discrimination claims stemming from Crabb's management style and World Kitchen's alleged discrimination in relation to opportunities to earn overtime pay. No opinion is expressed concerning Hubbell's November 2007 and July 2008 suspensions, which are the subject of a separate case pending before the court.

By the court,


 /s/ JOY FLOWERS CONTI    
Joy Flowers Conti
United States District Judge

Dated: February 24, 2010