IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| JANICE L. HUBBELL, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-1686 |
| | ) | |
| WORLD KITCHEN, LLC, WORLD KITCHEN, INC., UNITED STEEL WORKERS OF AMERICA, AFL-CIO-CLC-LOCAL 53 (A.K.A. THE UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION), and UNITED STEELWORKERS OF AMERICA D-10 (INTERNATIONAL), | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

**Conti, District Judge**

I.  *Introduction*

Pending before the court is a motion for reconsideration (Docket No. 89) filed by United Steelworkers of America, AFL-CIO-CLC-Local 53 ("USW Local 53") and United Steelworkers of America District 10 ("USW D-10," and together with USW Local 53, the "USW entities" or the "Union"). For the reasons that follow, the motion will be denied.

II.  *Legal Standard*

A motion for reconsideration is typically granted only if one of three situations is shown: "(1) an intervening change in controlling law, (2) the availability of new evidence not previously

available, or (3) the need to correct a clear error of law or to prevent manifest injustice." *Reich v. Compton*, 834 F.Supp. 753, 755 (E.D. Pa. 1993)(citing *Dodge v. Susquehanna Univ.*, 796 F.Supp. 829, 830 (M.D.Pa. 1992).

> Because of the interest in finality, at least at the district court level, motions for reconsideration should be granted sparingly; the parties are not free to relitigate issues the court has already decided. *Rottmund v. Continental Assurance Co.*, 813 F.Supp. 1104, 1107 (E.D.Pa. 1992). Stated another way, a motion for reconsideration is not properly grounded in a request for a district court to rethink a decision it has already made, rightly or wrongly.

*Williams v. Pittsburgh*, 32 F.Supp.2d 236, 238 (W.D. Pa. 1998).

### III.    *Discussion*[1]

The USW entities argue that the court erred in denying their motion for summary judgment with respect to the claims asserted by plaintiff Janice L. Hubbell ("Hubbell") concerning the failure of the Union to grieve her ten-day suspension for an incident occurring on June 1, 2006. (Doc. No. 90 at 4-12.) In a prior memorandum opinion dated February 24, 2010, the court determined that a genuine issue of material fact existed about whether Hubbell's employer, World Kitchen, LLC ("World Kitchen"), discriminated against her on the basis of sex when it imposed the suspension. *Hubbell v. World Kitchen, LLC, et al.*, Civil Action No. 06-1686, 2010 U.S. Dist. LEXIS 16209, at **59-72 (W.D.Pa. Feb. 24, 2010). The court also determined that a genuine issue of material fact existed concerning whether the USW entities discriminated against Hubbell on the basis of sex by abandoning the grievance process after

---

[1] For purposes of the instant motion for reconsideration, the court assumes familiarity with its prior memorandum opinion dated February 24, 2010. *Hubbell v. World Kitchen, LLC, et al.*, Civil Action No. 06-1686, 2010 U.S. Dist. LEXIS 16209 (W.D.Pa. Feb. 24, 2010). The operative facts will be discussed in this opinion only to the extent that they are directly relevant to the issues raised in support of (or in opposition to) the motion for reconsideration.

2

James Watt ("Watt"), a staff representative for USW D-10, viewed a surveillance tape depicting the incident in question. *Id.* at **89-91. Only the latter determination is presently at issue.

Hubbell's claims arise under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.,* and the Pennsylvania Human Relations Act ("PHRA"), 43 PA. STAT. §§ 951 *et seq.* The language of Title VII prohibiting sex and other kinds of discrimination by labor organizations is codified at 42 U.S.C. § 2000e-2(c), which provides:

> **(c) Labor organization practices.** It shall be an unlawful employment practice for a labor organization–
> (1) to exclude or to expel from its membership, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin;
> (2) to limit, segregate, or classify its membership or applicants for membership, or to classify or fail or refuse to refer for employment any individual, in any way which would deprive or tend to deprive any individual of employment opportunities, or would limit such employment opportunities or otherwise adversely affect his status as an employee or as an applicant for employment, because of such individual's race, color, religion, sex, or national origin; or
> (3) to cause or attempt to cause an employer to discriminate against an individual in violation of this section.

42 U.S.C. § 2000e-2(c). The PHRA declares it to be an "unlawful discriminatory practice"

> For any labor organization because of the . . . sex, . . . of any individual to deny full and equal membership rights to any individual or otherwise to discriminate against such individuals with respect to hire, tenure, terms, conditions or privileges of employment or any other matter, directly or indirectly, related to employment.

43 PA. CONS. STAT. ANN. § 955(c). The Pennsylvania courts generally construe the provisions of the PHRA to be consistent with their federal counterparts. *Stultz v. Reese Bros., Inc.*, 835 A.2d 754, 759 (Pa.Super.Ct. 2003). Therefore, the court's analysis of the claims under Title VII will also be dispositive of the parallel claims under the PHRA.

The United States Supreme Court has admonished that a distinction exists between what *constitutes* a violation of Title VII and what a plaintiff must show to *establish* such a violation in a judicial proceeding. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510-15 (2002)(recognizing a distinction between the *allegations* needed to *state* a claim and the *evidence* needed to *establish* a claim). The USW entities argue that Hubbell did not present evidence sufficient to establish that they violated her rights under Title VII. (Doc. No. 90 at 10-12.) In order to address properly the issues raised by the pending motion for reconsideration, the court must delineate the scope of Title VII's statutory protections before discussing the evidence contained in the record. The evidentiary issues must be understood in relation to the underlying legal issues.

The plain language of § 2000e-2(c)(1) declares it to be an "unlawful employment practice" for a labor organization "to exclude or to expel from its membership, *or otherwise to discriminate against*, any individual because of his [or her] . . . sex . . . ." 42 U.S.C. § 2000e-2(c)(1)(emphasis added). Since Hubbell does not allege that the Union "excluded" or "expelled" her from its membership, any liability of the Union under subsection (1) must stem from an allegation that it *otherwise discriminated* against her. In *Goodman v. Lukens Steel Co.*, 482 U.S. 656 (1987), the Supreme Court held that a union "discriminates" within the meaning of Title VII when it "pursue[s] a policy of rejecting disparate-treatment grievances presented by blacks solely because the claims assert racial bias and would be very troublesome to process." Id. at 669. The decision in *Goodman* affirmed a decision which had been issued by the United States Court of Appeals for the Third Circuit. *Goodman v. Lukens Steel Co.*, 777 F.2d 113 (3d Cir. 1985). In affirming the court of appeals' decision, the Supreme Court expressly relied on subsection (1)

without basing its holding on subsection (3). *Goodman*, 482 U.S. at 667. The Supreme Court explained:

> The Unions submit that the only basis for any liability in this case under Title VII is § 703(c)(3), which provides that a Union may not "cause or attempt to cause an employer to discriminate against an individual in violation of this section," 78 Stat. 256, 42 U.S.C. § 2000e-2(c)(3), and that nothing the District Court found and the Court of Appeals accepted justifies liability under this prohibition. We need not differ with the Unions on the reach of § 703(c)(3), for § 703(c)(1) makes it an unlawful practice for a Union to "exclude or to expel from its membership, *or otherwise to discriminate against*, any individual because of his race, color, religion, sex, or national origin." 78 Stat. 255, 42 U.S.C. § 2000-2(c)(1) [sic]. (Emphasis added.) Both courts below found that the Unions had indeed discriminated on the basis of race by the way in which they represented workers, and the Court of Appeals expressly held that "[t]he deliberate choice not to process grievances also violated § 703(c)(1) of Title VII." 777 F.2d, at 127. The plain language of the statute supports this conclusion.

*Goodman*, 482 U.S. at 667. This language makes clear that the Supreme Court's decision in *Goodman* was premised on the idea that a union itself *discriminated* within the meaning of subsection (1) when it refused to process grievances initiated by black employees alleging racial discrimination. The rationale in *Goodman* was not based on the idea that a union's failure to process such grievances could be characterized as the "cause" of racial discrimination perpetrated by an *employer* within the meaning of subsection (3).

The USW entities contend that a finding of union liability in this case is precluded by the decision of the United States Court of Appeals for the Third Circuit in *Anjelino v. New York Times Co.*, 200 F.3d 73 (3d Cir. 1999). They base their argument on the following passage from *Anjelino*:

> We will affirm the dismissal of all claims against the Union because the Union was not the employer of the appellants; this is so even though some of the supervisors and workers who are alleged to have discriminated against the appellants may have been members of the Union. While a union may be held

5

> liable under Title VII, the record here does not demonstrate that the Union *itself* instigated or actively supported the discriminatory acts allegedly experienced by the appellants. Therefore, the Union is not liable. See *Carbon Fuel Co. v. United Mine Workers*, 444 U.S. 212, 217-18, 100 S.Ct. 410, 62 L.Ed.2d 394 (1979); *Berger v. Iron Workers, Local 201*, 843 F.2d 1395, 1429-30 (D.C.Cir. 1988); see *Philadelphia Marine Trade Ass'n v. Local 291 Int'l Longshoremen's Ass'n*, 909 F.2d 754, 757 (3d Cir. 1990). Rather, the Times was the party responsible for assigning work to the appellants and ensuring that the work place was not contaminated with sex and race-based discrimination and harassment.

*Anjelino*, 200 F.3d at 95-96 (emphasis in original; footnote omitted). The USW entities rely on *Anjelino* for the proposition that Hubbell cannot proceed against them without showing that they "instigated or actively supported" the discrimination allegedly perpetrated by World Kitchen.

The court acknowledges that the record is devoid of evidence that the USW entities "instigated or actively supported" Hubbell's ten-day suspension. The basis for Hubbell's claims against the USW entities with respect to the suspension is their failure to grieve properly the suspension, not their hypothetical instigation of it. *Hubbell, supra*, at **89-91. At first glance, such a claim might appear to be precluded by *Anjelino*. A careful examination of the language in *Anjelino*, however, reveals that no conflict exists between that decision and this court's prior memorandum opinion.

In *Anjelino*, the court of appeals observed that "the Union was not the employer of the appellants; . . . even though some of the supervisors and workers who are alleged to have discriminated against the appellants may have been members of the Union." *Anjelino*, 200 F.3d at 95. While the precise theory of discrimination that was pursued by the plaintiffs in that case is not readily apparent from the four corners of the court of appeals' opinion, the observation quoted above suggests that the plaintiffs were attempting to impute the employer's discrimination to the union simply because the individuals responsible for that discrimination

6

were affiliated with the union as well as the employer. The court of appeals did not specify which subsection was at issue, but the tenor of its reasoning suggests that the plaintiffs were attempting to proceed under subsection (3), which declares it to be an "unlawful employment practice" for a labor organization "to cause or attempt to cause an employer to discriminate against an individual . . . ." 42 U.S.C. § 2000e-2(c)(3). In other words, *Angelino* governs where a plaintiff attempts to hold a union liable for discrimination perpetrated *by his or her employer*, not where an individual contends that the union was itself the *perpetrator* of discrimination. After all, a statement indicating that a union may have *instigated or actively supported* discriminatory acts implies that an entity other than the union itself has *perpetrated* such acts. This interpretation makes sense in light of the facts in *Anjelino*, in which an *employer* (through its agents) had been the perpetrator of "the discriminatory acts allegedly experienced by the appellants." *Anjelino*, 200 F.3d at 95. The standard articulated in *Anjelino* does not appear to be applicable in cases arising under subsection (1), which governs where a union itself *discriminates* against a member or applicant for membership. *Goodman*, 482 U.S. at 667.

In *Anjelino*, the court of appeals did not cite or reference the Supreme Court's decision in *Goodman*. *Anjelino*, 200 F.3d at 96. The court of appeals did, however, cite the decision of the United States Court of Appeals for the District of Columbia Circuit in *Berger v. Iron Workers Reinforced Rodmen Local 201*, 843 F.2d 1395 (D.C.Cir. 1988). In *Berger*, the District of Columbia Circuit Court of Appeals observed:

> We do not doubt that a labor organization may in some circumstances have an obligation actively to oppose discriminatory conduct on the part of individuals or entities with which it has no agency relationship, see *Goodman v. Lukens Steel Co.*, 482 U.S. 656, 107 S.Ct. 2617, 2625, 96 L.Ed.2d 572 (1987); *Macklin v. Spector Freight Sys.*, 478 F.2d 979, 989 (D.C.Cir. 1973), and our discussion

7

> above should not be read as indicating anything to the contrary. Neither *Goodman* nor any other case, however, suggests that a union's failure to act in opposition to discriminatory practices of an organization with which it has no agency relationship renders it vicariously liable for that organization's discriminatory practices; rather, the point of those cases is that the union's failure to act may be an independent basis for liability under Title VII and section 1981. In this case, therefore, the concerns underlying *Goodman* and *Macklin*, and the question whether the International has breached an affirmative duty to oppose the discriminatory practices of Local 201, are inapposite. The plaintiffs did not argue before the district court, and do not argue before this court, that they were discriminated against by International's failure to act, in breach of an affirmative duty; rather, they argue that the International is vicariously liable for the discriminatory conduct of Local 201. Thus, breach of an affirmative duty is not the theory against which the evidence in this case must be measured. The International's liability depends upon the existence of an agency relationship between the International and Local 201.

*Berger*, 843 F.2d at 1429-30 (footnote omitted). This paragraph begins and ends on the same two pages of the opinion in *Berger* referenced in the citation found in the Court of Appeals for the Third Circuit's opinion in *Anjelino*.[2] *Anjelino*, 200 F.3d at 96. Although the Third Circuit Court of Appeals did not fully articulate its reasoning, its citation to this particular paragraph in *Berger* illustrates that the reasoning in *Berger* provides the framework for distinguishing between cases governed by *Goodman* and cases governed by *Anjelino*. Where a plaintiff contends that a labor organization is liable for discrimination engaged in *by an employer*, *Anjelino* precludes a finding of union liability in the absence of evidence that the union "instigated or actively supported" the underlying acts of discrimination. *Id.* at 95. Such cases are likely to arise under subsection (3), which declares it to be an "unlawful employment practice" for a labor

---

[2]The other two decisions cited in the relevant portion of the opinion in *Anjelino v. New York Times*, 200 F.3d 73, 96 (3d Cir. 1999), did not involve Title VII. Instead, they concerned whether international unions were responsible under § 301 of the Labor Management Relations Act of 1947 ("LMRA"), 29 U.S.C. § 185, for "wildcat" strikes engaged in by local unions in violation of the applicable collective bargaining agreements. *Carbon Fuel Co. v. UMWA*, 444 U.S. 212, 213-22 (1979); *Phila. Marine Trade Ass'n*, 909 F.2d 754, 755-59 (3d Cir. 1990). Those decisions are not relevant to the court's analysis in this opinion.

organization "to cause or attempt to cause *an employer* to discriminate against an individual . . . ." 42 U.S.C. § 2000e-2(c)(3)(emphasis added). On the other hand, the inquiry is governed by subsection (1) (and decisions such as *Goodman*) where a plaintiff asserts that a union has engaged in *its own* discrimination. 42 U.S.C. § 2000e-2(c)(1); *Goodman*, 482 U.S. at 667.

Hubbell's filings make clear that her claims against the USW entities are based upon the actions or inactions of the Union itself, and not on the underlying discriminatory acts allegedly committed by World Kitchen. Compl. ¶ 12(g). She is not attempting to hold the USW entities vicariously liable for World Kitchen's discrimination. Instead, she alleges discrimination *committed by* the USW entities. Therefore, her claims are governed by the standard enunciated in *Goodman*, rather than by the standard enunciated in *Anjelino*. *Berger*, 843 F.2d at 1429-30.

Having determined that Hubbell's claims are governed by *Goodman*, the court must consider the substantive requirements of subsection (1) as construed in that decision. The USW entities argue that *Goodman* is applicable only where a union maintains a *policy* of refusing to file or pursue *any and all grievances* presented by members of a statutorily-protected class. This argument is unpersuasive. Title VII, among other things, prohibits discrete acts of discrimination. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002)("Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'"). This case is not a "pattern or practice" case brought by the Attorney General pursuant to 42 U.S.C. § 2000e-6(a). Instead, it is an action brought by a private individual to redress discrete incidents of alleged discrimination. Consequently, Hubbell need only establish that the USW entities engaged in a single act of

discrimination to hold the Union liable under Title VII. *King v. Laborers Int'l Union of N. Am.*, 443 F.2d 273, 277-78 (6th Cir. 1971).

The union at issue in *Goodman* had maintained a *policy* of "rejecting disparate-treatment grievances presented by blacks solely because the claims assert[ed] racial bias and w[ere] very troublesome to process." *Goodman*, 482 U.S. at 669. It does not follow, however, that a plaintiff attempting to proceed under Title VII with a claim similar to those brought by the plaintiffs in that case must establish the existence of a discriminatory policy (rather than merely the commission of a single discriminatory act) in order to prevail. Subsection (1) declares it to be an "unlawful employment practice" for a labor organization "to exclude or to expel from its membership, or otherwise to discriminate against, any *individual* because of his [or her] race, color, religion, sex, or national origin . . . ." 42 U.S.C. § 2000e-2(c)(1)(emphasis added). The statutory protections afforded thereunder are implicated when an act of discrimination occurs.

In *Goodman*, the Supreme Court construed the phrase "otherwise to discriminate" broadly enough to encompass a "deliberate choice not to process grievances." *Goodman*, 482 U.S. at 667. Because a Title VII claim may be raised when there is a single act of discrimination, a deliberate choice by a union not to process *a grievance* may give rise to a claim against it. "Numerous private cases have found a Title VII violation upon showings of proof *limited to a single act* (e.g. a single breach of the duty of fair representation; a discharge or failure to train for advancement based upon racial motivations or causes) . . . ." *King*, 443 F.2d at 278 (emphasis added). Hubbell's claims against the USW entities are not foreclosed simply because her "factual presentation" is less "compelling" than that made by the plaintiffs in *Goodman*. *Durko v. OI-NEG TV Prods., Inc.*, 870 F.Supp. 1268, 1277 (M.D.Pa. 1994).

10

In *Romero v. Union Pacific Railroad*, 615 F.2d 1303 (10th Cir. 1980), the United States Court of Appeals for the Tenth Circuit declared that "[a] union cannot acquiesce in a company's prohibited employment discrimination and expect to evade Title VII liability for such discrimination." Id. at 1311. This court referenced that statement in its prior memorandum opinion. *Hubbell, supra*, at *90. In light of the USW entities questioning the court's reliance on this language in *Romero*, a more detailed explanation concerning what constitutes *acquiescence* is warranted.

In *York v. American Telephone & Telegraph Co.*, 95 F.3d 948 (10th Cir. 1996), the Court of Appeals for the Tenth Circuit clarified that "mere inaction does not constitute acquiescence." Id. at 956. Instead, "acquiescence" requires *both* "knowledge that prohibited discrimination may have occurred" *and* "a decision not to assert the discrimination claim." *York*, 95 F.3d at 956-57. Courts within the Tenth Circuit continue to apply this standard for determining whether a union has acquiesced in discrimination. *See Perez v. United Air Lines, Inc.*, 362 F.Supp.2d 1230, 1240-41 (D.Colo. 2005). Admittedly, a union has no affirmative duty to monitor independently an employer's activities in the absence of complaints from its members. *Thorn v. Amalgamated Transit Union*, 305 F.3d 826, 832-33 (8th Cir. 2002). Title VII does not require a union to "police" its members' workplace. *EEOC v. Pipefitters Ass'n Local Union 597*, 334 F.3d 656, 662 (7th Cir. 2003). Courts within this circuit, however, have indicated (both before and after the court of appeals' decision in *Anjelino*) that where an aggrieved employee affirmatively requests union intervention to remedy an act of discrimination committed by his or her employer, a deliberate refusal or failure to act on that request may subject the union to liability under Title VII. *Slater v. Susquehanna County*, 613 F.Supp.2d 653, 664 (M.D.Pa. 2009)(granting summary

11

judgment in favor of a union because the plaintiff failed to provide evidence that she actually requested remedial action by the union); *Durko*, 870 F.Supp. at 1277 (denying a union's motion for summary judgment because the plaintiff provided evidence that her affirmative request for union intervention was ignored). The Supreme Court observed, albeit in dicta, that the relevant antidiscrimination provision contained in the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621 *et seq.,* provides "remedies for the situation where a labor union is less than vigorous in defense of its members' claims of discrimination under the ADEA."[3] *14 Penn Plaza LLC v. Pyett*, 129 S.Ct. 1456, 1473 (2009). This observation is preceded by a citation to *Goodman*. The clear indication from these decisions is that unions knowingly ignore meritorious claims of discrimination at their legal peril.

Since Title VII is an antidiscrimination statute, Hubbell cannot prevail in her claims against the USW entities absent a showing that the grievance process was abandoned for *discriminatory* reasons. *See Tillman v. Pepsi Bottling Group, Inc.*, 538 F.Supp.2d 754, 770 (D.Del. 2008); *Ellison v. Plumbers & Steam Fitters Union Local 375*, 118 P.3d 1070, 1076 (Alaska 2005). The evidence – reviewed in the light most favorable to plaintiff – indicates that, on June 1, 2006, both Hubbell and Don Kearns ("Kearns"), a male employee, were working without wearing protective gloves on both hands, in violation of World Kitchen's safety rules. *Hubbell, supra*, at *59. They were approached by their supervisor, Robert Crabb ("Crabb"), who reminded them to wear two gloves while working. *Id.* Hubbell ultimately received a ten-day

---

[3] The antidiscrimination provision of the ADEA applicable to "labor organizations" is not materially different from that contained in Title VII. 29 U.S.C. § 623(c). The ADEA declares it to be "unlawful" for a labor organization "to exclude or to expel from its membership, or otherwise to discriminate against, any individual because of his age," or for a labor organization "to cause or attempt to cause an employer to discriminate against an individual in violation of [the ADEA]." 29 U.S.C. § 623(c)(1), (3).

suspension as a result of this incident, while Kearns was not disciplined. *Id.* at *61. World Kitchen argues that Hubbell was suspended for insubordination in connection with her *reaction* to Crabb's admonition, and not for her simple failure to comply with the applicable safety rule. *Id.* Because Hubbell disputes World Kitchen's characterization of the events in question, contending that she was suspended for engaging in conduct that was not materially different from that engaged in by Kearns, a genuine issue of material fact exists concerning whether World Kitchen suspended Hubbell *because of her sex*. *Id.* at **67-72. Given that Hubbell is the party opposing the entry of summary judgment in this case, the court must view the evidence in the light most favorable to her. *Rite Aid of Pa., Inc. v. United Food & Commercial Workers Union*, 595 F.3d 128, 131 (3d Cir. 2010). The court's analysis proceeds under that standard and views the evidence to show that Hubbell's conduct was not materially different from that of Kearn, and that World Kitchen suspended her *because of her sex*.

Hubbell was notified of her suspension on June 22, 2006. (App. in Support of USW Defs.' Mot. for Summary J., Tab 27.) During her deposition, she testified that she wrote a letter to Union President Patrick J. Cahill ("Cahill") and Watt on June 24, 2006, requesting union intervention. (Doc. No. 66-2 at 42; Hubbell Dep. at 162.) On August 9, 2006, Cahill initiated the grievance process in connection with the suspension. (App. in Supp. of USW Defs.' Mot. for Summ. J., Tab 30.) In a declaration dated April 22, 2009, Watt stated that he elected to abandon the grievance process in late August 2006, after viewing a surveillance tape of the incident involving Hubbell, Kearns and Crabb. (App. in Supp. of USW Defs.' Mot. for Summ. J., Tab A; Watt Dec. at ¶ 43.) According to Watt – and disputed by Hubbell – the depiction of events portrayed on the surveillance tape led him to believe that Hubbell refused to put on a pair of

gloves when ordered to do so, and that Kearns did not similarly disobey Crabb's instructions. (Doc. No. 66-7 at 32; Watt Dep. at 121-23.)

As noted earlier, the USW entities are not liable for any acts of discrimination committed by World Kitchen. *Anjelino*, 200 F.3d at 95-96; *Berger*, 843 F.2d at 1429-30. Nevertheless, the Union can be held liable under Title VII for *its own* discrimination. 42 U.S.C. § 2000e-2(c)(1); *Goodman*, 482 U.S. at 667. Viewing the evidence in the light most favorable to Hubbell, there is evidence to show that Hubbell was not insubordinate, that she was treated more harshly than Kearns because of her sex, and that the surveillance tape failed to substantiate World Kitchen's reasons for issuing the suspension.[4] *Hubbell, supra*, at **59-72. Because the applicable collective bargaining agreement contained both terms prohibiting sex-based discrimination and terms requiring World Kitchen to comply with all relevant antidiscrimination statutes, World Kitchen's alleged violation of Title VII also constituted a violation of the collective bargaining agreement. *Id.* at **77-78. Watt's decision to abandon the grievance process left World Kitchen's alleged violation of the collective bargaining agreement unremedied. The only question that remains is whether the record contains evidence permitting an inference that Watt's decision was itself attributable to a discriminatory motive. *Tillman*, 538 F.Supp.2d at 770.

In order to establish a prima facie case of discrimination, thereby shifting the burden of production to the USW entities, Hubbell need only provide evidence adequate to create an

---

[4] Had the surveillance tape itself been submitted as a part of the summary judgment record, it could have been viewed by the court and considered for the purpose of determining whether World Kitchen and the USW entities are entitled to a judgment as a matter of law. *Scott v. Harris*, 550 U.S. 372, 378-81 (2007).

inference that the decision at issue was based on an illegal discriminatory criterion (i.e., sex).[5] *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312-13 (1996); *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 355 (3d Cir. 1999); *Roach v. Am. Radio Sys. Corp.*, 80 F.Supp.2d 530, 531-32 (W.D.Pa. 1999). "The burden of establishing a prima facie case of disparate treatment is not onerous." *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). The USW entities argue that Watt's awareness of World Kitchen's "discrimination" cannot support an inference that his decision not to pursue Hubbell's grievance was attributable to a similar discriminatory motive. (Doc. No. 90 at 11-12.) The decision of the United States District Court for the District of Rhode Island in *Rainey v. Town of Warren*, 80 F.Supp.2d 5 (D.R.I. 2000), suggests otherwise. In *Rainey*, the district court determined that a union's awareness of actual discrimination could give rise to an inference that a decision declining to grieve that discrimination was itself attributable to a discriminatory motive. *Rainey*, 80 F.Supp.2d at 18 ("In light of the severe and constant harassment endured by plaintiff, of which the union was aware, it is reasonable to infer, for purposes of this motion, that the Local Union failed to file grievances because of some discriminatory motive or attitude which pervaded both the Union and plaintiff's place of work."). While a showing that a union has made a deliberate decision to abandon the grievance process in connection with an instance of known discrimination may not always suffice

---

[5] In this particular context, Hubbell can establish a prima facie case of discrimination against the Union by showing that: (1) World Kitchen discriminated against her in a manner which constituted a violation of the collective bargaining agreement; (2) she affirmatively requested union intervention to redress the discrimination; and (3) the Union deliberately ignored her request. *Slater v. Susquehanna County*, 613 F.Supp.2d 653, 664 (M.D.Pa. 2009); *Durko v. OI-NEG TV Prods., Inc.*, 870 F.Supp. 1268, 1277 (M.D.Pa. 1994). Where a union *deliberately* decides to ignore a member's request to grieve a *known* instance of trait-based discrimination, an inference that the union has acted on the basis of a discriminatory motive can be drawn without specific evidence that a member outside of the plaintiff's protected class has received more favorable treatment. *Rainey v. Town of Warren*, 80 F.Supp.2d 5, 18 (D.R.I. 2000).

to defeat a properly supported motion for summary judgment, it is at least adequate to satisfy the *de minimis* threshold needed to shift the burden of production to the defendant. *Sassaman v. Gamache*, 566 F.3d 307, 312 (2d Cir. 2009)(referring to the plaintiff's burden of establishing a prima facie case as "*de minimis*").

The prima facie hurdle "'is not onerous' and poses 'a burden easily met.'" *Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358, 365 (3d Cir. 2008) (quoting *Burdine*, 450 U.S. at 253). In most instances, a prima facie case can be established merely upon a showing that a similarly situated individual outside of the plaintiff's statutorily-protected class was treated more favorably than the plaintiff. *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 539 (3d Cir. 2006). The prima facie inquiry does not account for the "background circumstances" surrounding the underlying facts, which are normally considered at the pretext stage of the analysis. *Iadimarco v. Runyon*, 190 F.3d 151, 161-63 (3d Cir. 1999). In *Goodman*, the Supreme Court characterized a union's deliberate decision to reject a grievance brought by a member of a protected class alleging employment discrimination as *discrimination by the union itself*. *Goodman*, 482 U.S. at 667. When the facts in this case are viewed in the light most favorable to Hubbell (as they must be at this stage), the suspension constituted "discrimination" under Title VII.[6] *Hubbell, supra*, at **59-72. It is undisputed that Watt decided to abandon the

---

[6] In support of its motion for reconsideration, the Union calls the court's attention to the unpublished decision of the United States Court of Appeals for the Third Circuit in *Martinez v. International Brotherhood of Electrical Workers*, No. 09-2894, 2009 U.S. App. LEXIS 25419 (3d Cir. Nov. 19, 2009). *Martinez* is distinguishable from the instant case in that it involved a situation in which a determination had already been made that the plaintiff's employer was not guilty of discrimination. *Martinez*, 2009 U.S. App. LEXIS 25419, at *7 (partially basing an affirmance on a district court's application of the doctrine of collateral estoppel). Because the court's analysis in this case proceeds on viewing the evidence in the light most favorable to Hubbell and that evidence supports Hubbell's underlying claim of discrimination against World Kitchen, the rationale employed by the Court of Appeals in *Martinez* does not warrant the entry of summary judgment in favor of the USW entities. *Rainey*, 80 F.Supp.2d at 18 ("In those cases where summary judgment was granted or the union was found not liable

grievance process immediately after viewing a surveillance tape of the incident leading to Hubbell's suspension. (App. in Supp. of USW Defs.' Mot. for Summ. J., Tab A; Watt Dec. at ¶ 43.) Because the tape (if Hubbell's version of the incident is believed) would have depicted "discrimination" (i.e., disparate treatment between Hubbell and Kearns), and since Watt's decision not to continue with the grievance procedure was based on his viewing of the tape, an inference of discriminatory motive could reasonably be drawn at the prima facie stage.[7] *Rainey*, 80 F.Supp.2d at 18; *Hubbell, supra*, at **89-91.

The inference of discrimination arising from Hubbell's prima facie case shifts the burden of production to the USW entities to articulate a legitimate, nondiscriminatory reason for abandoning the grievance process. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). The USW entities satisfy their burden of production by producing evidence that Hubbell was really suspended for insubordination, that Kearns had not been insubordinate, and that Watt abandoned the grievance process for that reason. (App. in Supp. of USW Defs.' Mot. for Summ. J., Tab A; Watt Dec. ¶¶ 35-43.) Because Hubbell's description of the events in question differed from that provided by Crabb (and from that allegedly depicted in the surveillance tape viewed by

---

under the acquiescence theory, the rationale grounding the determination was that the employer was ultimately found not to have discriminated against the plaintiff or created a hostile work environment. That is not the case here.").

[7]No inference of discriminatory motive can be drawn from the Union's decision not to pursue the other grievances asserted by Hubbell, since those grievances were not based on arguably meritorious claims of discrimination by World Kitchen, which is why summary judgment was entered in favor of the USW entities with respect to Hubbell's other claims. *Hubbell, supra*, at **72-89. This factor is what distinguishes the grievance based on the ten-day suspension from the other grievances. *Id.* at **89-90 ("Because the underlying claim supporting Hubbell's grievance is buttressed by a reasonable inference of sex-based discrimination on the part of World Kitchen, a reasonable trier of fact could infer from Watt's inaction that he may have declined to proceed with the grievance process *because it was based on an underlying claim of discrimination*.")(emphasis added). Where a grievance is *not* based on an underlying claim of discrimination, an inference of discriminatory motive cannot be drawn in the absence of evidence that individuals outside of the plaintiff's class were more favorably treated. *Id.* at **72-89.

17

Watt), however, the matter is not amenable to resolution at the summary judgment stage. *Hubbell, supra*, at **59-72, 89-91. If Hubbell's testimony is believed (as it must be at this stage), a reasonable trier of fact could find World Kitchen's reason for the suspension and Watt's corresponding explanation for not proceeding with the grievance process to be "unworthy of credence." *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994). Hubbell is not required to "introduce additional, independent evidence of discrimination" to defeat the Union's motion for summary judgment.[8] *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149 (2000). Where an explanation for an adverse action provided by a defendant is discredited, "it is *permissible* for the trier of fact to infer the ultimate fact of discrimination from the falsity of the [defendant's] explanation." *Id.* at 147 (emphasis in original).

In denying the Union's motion for reconsideration at this stage, the court does not suggest that Hubbell can hold the Union liable under Title VII merely by showing that World Kitchen engaged in sex-based discrimination. To prevail against the Union, Hubbell will still need to prove that Watt's decision to abandon the grievance process was tainted by a discriminatory animus – even if Hubbell succeeds in proving that World Kitchen violated Title VII when it issued the ten-day suspension. *Casamento v. Massachusetts Bay Transp. Auth.*, 559 F.Supp.2d 110, 118-19 (D.Mass. 2008). A genuine issue of material fact exists about whether the USW entities violated Title VII by deliberately refusing to contest a suspension that, when viewed in

---

[8]The court acknowledges that the prima facie and pretext inquiries converge in this case, since both are predicated on Hubbell's testimony (which is assumed to be true) that she was not insubordinate, that she was treated differently from her male colleague, and that one could substantiate her testimony by viewing the surveillance tape. (Doc. No. 66-2 at 20-21; Hubbell Dep. at 75-79.) This evidentiary overlap, however, is not fatal to Hubbell's claims against the USW entities. The United States Court of Appeals for the Third Circuit has noted that the prima facie and pretext inquiries "often overlap," and that a court is not required "to ration the evidence between one stage or the other." *Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358, 370 (3d Cir. 2008).

the light most favorable to Hubbell, may constitute an underlying violation of Title VII by World Kitchen. *Durko*, 870 F.Supp. at 1277.

IV. *Conclusion*

For the foregoing reasons, the motion for reconsideration filed by the USW entities (Docket No. 89) will be denied. The court expresses no opinion concerning the factual issues that will ultimately be resolved by the trier of fact.

    By the court,

    /s/ JOY FLOWERS CONTI
    Joy Flowers Conti
    United States District Judge

Dated: June 9, 2010