# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JANICE L. HUBBELL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 06-1686 |
| | ) |
| WORLD KITCHEN, LLC, WORLD KITCHEN, INC., UNITED STEEL WORKERS OF AMERICA, AFL-CIO-CLC-LOCAL 53 (A.K.A. THE UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION), and UNITED STEELWORKERS OF AMERICA D-10 (INTERNATIONAL), | ) |
| Defendants. | ) |

## MEMORANDUM OPINION

**CONTI, District Judge**

### I. Introduction

Pending before the court are motions for reconsideration of the partial denial of motions for summary judgment (ECF Nos. 104 & 107) filed by defendants, World Kitchen, LLC ("World Kitchen"), United Steel Workers of America, AFL-CIO-CLC-Local 53 ("USW Local 53") and United Steelworkers of America District 10 ("USW D-10" and, together with USW Local 53, the "USW entities" or the "Union"). For the reasons that follow, these motions will be granted.

### II. Legal Standard

A motion for reconsideration is typically granted only if one of three situations is shown: "(1) an intervening change in controlling law, (2) the availability of new evidence not previously

available, or (3) the need to correct a clear error of law or to prevent manifest injustice." *Reich v. Compton*, 834 F.Supp. 753, 755 (E.D.Pa. 1993)(citing *Dodge v. Susquehanna Univ.*, 796 F.Supp. 829, 830 (M.D.Pa. 1992)).

> Because of the interest in finality, at least at the district court level, motions for reconsideration should be granted sparingly; the parties are not free to relitigate issues the court has already decided. *Rottmund v. Continental Assurance Co.*, 813 F.Supp. 1104, 1107 (E.D.Pa. 1992). Stated another way, a motion for reconsideration is not properly grounded in a request for a district court to rethink a decision it has already made, rightly or wrongly. *Glendon Energy Co. v. Borough of Glendon*, 836 F.Supp. 1109, 1122 (E.D.Pa. 1993).

*Williams v. City of Pittsburgh*, 32 F.Supp.2d 236, 238 (W.D.Pa. 1998).

### III. Background[1]

Hubbell commenced this action against World Kitchen, the Union and Robert Crabb ("Crabb") on December 21, 2006, alleging violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*, the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq.*, and the Pennsylvania Human Relations Act ("PHRA"), 43 PA. CON. STAT. ANN. §§ 951 *et seq.* (ECF No. 1). On February 12, 2009, the parties stipulated to the dismissal of Crabb as a defendant in this action. (ECF No. 46). On April 24, 2009, World Kitchen and the Union filed separate motions for summary judgment. (ECF Nos. 52 & 56). The motions were partially granted and partially denied in a memorandum opinion and order dated February 24, 2010. *Hubbell v. World Kitchen, LLC.*, 688 F.Supp.2d 401 (W.D.Pa. 2010). The Union filed a motion for reconsideration on March 12, 2010. (ECF No. 89). The motion was denied in a memorandum opinion and order dated June 9, 2010. *Hubbell v. World Kitchen, LLC,* Civil Action No. 06-1686, 2010 U.S. Dist. LEXIS 56584 (W.D.Pa. June 9, 2010). The pending

---

[1] For purposes of the instant motion for reconsideration, the court assumes familiarity with its prior memorandum opinions dated February 24, 2010, and June 9, 2010. *Hubbell v. World Kitchen, LLC,* 688 F.Supp.2d 401 (W.D.Pa. 2010); *Hubbell v. World Kitchen, LLC,* Civil Action No. 06-1686, 2010 U.S. Dist. LEXIS 56584 (W.D.Pa. June 9, 2010). The operative facts will be discussed in this opinion only to the extent that they are directly relevant to the pending motions for reconsideration.

motions for reconsideration were filed respectively by the Union and World Kitchen on July 9, 2010, and July 12, 2010. (ECF Nos. 104 & 107).

Hubbell works as a selector and back-up quality control inspector for World Kitchen. *Hubbell*, 688 F.Supp.2d at 404. She performs her duties at a plant located in Charleroi, Pennsylvania. *Id.* As a selector, Hubbell examines completed kitchen and cooking products (before they are packaged for shipment) in order to ensure that they meet the applicable production specifications. *Id.* at 404-05.

The claims remaining in this case concern a ten-day suspension imposed on Hubbell by World Kitchen for conduct occurring on June 1, 2006. *Id.* at 424-29, 434-35. In order to ensure the safety of its employees, World Kitchen requires its selectors to wear gloves on both hands while performing their duties. *Id.* at 409. During the early morning hours of June 1, 2006, Hubbell and Don Kearns ("Kearns"), a male employee, were each wearing only a single glove while working as selectors. *Id.* Their immediate supervisor, Crabb, approached them and reminded them about World Kitchen's safety rule requiring selectors to wear gloves on both hands. *Id.* After hearing Crabb's admonition, Kearns immediately pulled out a second glove and put it on his exposed hand. *Id.* Hubbell did not do so. Instead, she testified she refused to wear a nearby glove because it had already been worn by another employee. *Id.* At 4:18 a.m., Crabb sent an email to Donald Good ("Good"), World Kitchen's human resources manager for the Charleroi plant, complaining about Hubbell's alleged refusal to follow his instructions and urging Good to view a surveillance tape of the incident. *Id.* at 426. On June 22, 2006, Hubbell received a ten-day suspension in connection with her failure to wear two gloves and related "insubordination." *Id.* at 410, 424-25.

Hubbell's suspension took effect on June 23, 2006. *Id.* at 426. On the next day, Hubbell sent a letter to Union President Patrick J. Cahill ("Cahill") and Union Staff Representative James Watt ("Watt") requesting that the Union initiate the applicable grievance procedure and contest the suspension. *Hubbell*, 2010 U.S. Dist. LEXIS 56584, at *23. Hubbell returned to work on July 3, 2006. *Hubbell*, 688 F.Supp.2d at 426. On August 9, 2006, Cahill initiated the grievance procedure on behalf of Hubbell. *Id.* Later that month, however, Watt decided to abandon the grievance procedure after viewing the surveillance tape depicting the incident of June 1, 2006. *Id.* at 410.

In the memorandum opinion of February 24, 2010, the court determined that Hubbell had established a prima facie case of sex-based discrimination against World Kitchen, given that Kearns had not been suspended for failing to wear two gloves while working as a selector. *Hubbell*, 688 F.Supp.2d at 424. Hubbell's prima facie case shifted the burden of production to World Kitchen to articulate a legitimate, nondiscriminatory reason for suspending Hubbell. *Id.* World Kitchen satisfied this burden by producing documentary and testimonial evidence that Hubbell had been suspended for insubordination rather than for failing to strictly comply with the applicable safety rule. *Id.* at 424-26. The relevant documentary evidence demonstrated that Hubbell, unlike Kearns, had been formally warned on November 11, 2005, that her failure to wear two gloves was in violation of the safety rules applicable to selectors working in the Charleroi plant. *Id.* at 424. In addition, the written notice of Hubbell's suspension, which had been signed by Good on June 22, 2006, contained the following language:

> **You have been cited as Violating Plant/Safety Rule:**
> - Level 1, Number 6
>   - Required safety equipment and PPE, per department, must be worn when performing designated tasks. (i.e. respirators, protective aprons, goggles, steel toed shoes, proper hearing protection, etc.)

4

- On June 1, 2006 employee was not wearing two gloves on line 115. Supervisor instructed employee to put the glove on and she refused stating he was to write her up. Supervisor returned and employee still refused to wear proper PPE. Notice of two glove rule posted in plant and employee should be aware.
- June 1, 2006
- Level 3, Number 1
  - Insubordination and refusal to perform an assigned task will not be permitted.
  - One June 1, Supervisor Crabb requested Janice Hubbell to put on the second glove and she refused. Employee asked supervisor Crabb to write her up. The other employee on the line was also without a second glove and when asked, he complied immediately. Ms. Hubbell was insubordinate concerning a direct order from her supervisor to wear her proper PPE and work safely. She refused and evidence is clear she was insubordinate.
  - June 1, 2006

*Id.* at 424-25. This documentary evidence supported World Kitchen's assertion that Hubbell had not been treated more harshly than Kearns because of her sex. *Id.* at 426.

In order to provide further support for its position, World Kitchen pointed to deposition testimony which had been given by Crabb. During the course of his deposition, Crabb testified as follows:

Q. And we talked earlier today about a write-up in June 2006 with Ms. Hubbell. On that incident can you explain for us in a little bit more detail what happened on that particular day? I believe it was June 1st of 2006.

A. That's the incident with Ms. Hubbell and Don [Kearns] I believe.

Q. Yes.

A. I came by the end of the line, I noticed that they were not wearing gloves on both hands. I walked up to Mr. [Kearns], told him—explained to him—he was a new hire at this time, I explained to him that gloves have to be worn on both hands so you don't get cut. He said okay, he took his glove out of his pocket, put it on his hands. I leaned over across the belt which would be a good four foot away, I leaned towards Janice and told her she knows better, she's been here long enough, she knows she should have gloves on both hands, and I told her to put gloves on both hands. At that point I left the area, made a round through the automatics department, stopped into the automatics lining coordinator's office to talk with one of

5

my line coordinators, I noticed on a monitor—this could have been four, five minutes transpired by this time, I noticed on the monitor that Janice still didn't put a glove on. So I went back out to the line. At this time I told her I was going to write her up for not having gloves on both hands. At that point she told me go ahead and write her up. I said go ahead and put gloves on both hands. At that point she told me I only have one glove. I said, well, there's a glove sitting right there on your table. She said, that's dirty, I'm not wearing it. She jumped up out of her seat at that point and said I ain't putting that glove on. I said, where's your gloves. She said, I'll go get them. I said, no, I will go get them. So I walked back to the rack that held the gloves, probably 30 feet from where she was working, grabbed a pair of gloves, came back, gave them to Ms. Hubbell, at that point went back to my office, filled out the safety violation slip and came back out and gave her copy of it.

Q. Whose responsibility is it to have gloves with them while they're working?

A. The employees should pick those gloves up from the glove areas. There's three or four of them throughout the selecting area to get gloves from. You can grab a hundred pair a day if need be.

Q. Did I hear you correctly that there was a bin of clean gloves about 30 or 40 feet from where she was working?

A. From that selection end, yes, there's some probably no more than 30 foot away.

Q. On that day did anybody else refuse to put on gloves when you asked them to?

A. Don [Kearns], the other one I noticed at the same time, had no problems taking his glove out of his pocket and putting it on immediately.

Q. If Janice had complied with your request in those four or five minutes and put a glove on, do you believe she would have been written up that day?

A. No, she would have never even got a violation if she would have put it on.

6

*Id.* at 425-26. Crabb's testimony, along with the documentary evidence of Hubbell's warning of November 11, 2005, and disciplinary notice of June 22, 2006, was sufficient to satisfy World Kitchen's burden of production.[2]

In the opinion of February 24, 2010, the court determined that Hubbell's deposition testimony had undermined World Kitchen's asserted version of the facts, thereby precluding the entry of summary judgment with respect to the claims involving the suspension. *Hubbell*, 688 F.Supp.2d at 426-29. During the course of her deposition, Hubbell testified as follows:

> Q. There's some safety rules in working at the plant as far as wearing certain clothing and certain protections; is that right?
>
> A. Yes.
>
> Q. And you're aware of a safety rule that you're supposed to have two gloves on your hands?
>
> A. Yes.
>
> Q. Is it fair that on this date, June 1st, 2006, you were only wearing one glove?
>
> A. Yes.
>
> Q. Your supervisor at the time was Robert Crabb?
>
> A. Yes.
>
> Q. He came to you and asked you to put on another glove?
>
> A. Yes.
>
> Q. Did you comply with that request?
>
> A. He asked me to put on the dirty gloves that were on the table next to me, and there was a witness right next to him, standing on the other side, and I said those are dirty gloves, I'm not going to put those on.

---

[2] In order to satisfy its burden of production in an employment discrimination case such as this, a defendant "must clearly set forth, through the introduction of admissible evidence," the reasons for the adverse employment action at issue. *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 (1981).

7

Q. Do you have your own gloves or are there just gloves that everybody shares?

A. You go get gloves. There's a little place where you can get them.

Q. Did you go get other gloves?

A. Well, I started to go get them, and he started screaming at me, and he went and got them, and I put it on.

Q. You put it on after he gave it to you?

A. Yeah.

Q. What do you mean he started screaming at you?

A. It's on tape. The whole incident is on tape.

Q. Well, I'd like your version.

A. He come over in front of my hamper where I was selecting screaming at me that he was going to write me up, he was going to have me fired, blah, blah, blah and just kept carrying on for a good few minutes. It's all on tape, you know, and nobody ever investigated, there's no grievance on it. Nothing was done, no witnesses interviewed.

Q. Well, when he first told you to put on gloves you refused to do so because they were dirty in your opinion?

A. I told him, I said, those aren't my gloves, those are dirty.

Q. And he asked you where are your gloves?

A. He said, don't you have gloves, I said no, and I started to go get it, and he started screaming at me.

Q. Did you tell him that you were going to get gloves?

A. Yeah.

Q. What did you say?

A. I said I'm going to go get them. I can't even remember what he said, but he said I'll get them. And he brought them back, and I put it on. And then he came around to my side, he was on the opposite side of the belt. He

came around to my side, stood directly in front of me, standing there screaming at me.

Q. Saying what?

A. That he was going to write me up and he was going to have me suspended, terminated, he goes through the whole nine yards.

Q. Because you weren't wearing your gloves?

A. Yes.

Q. Now you said that other people don't wear glove?

A. Yes.

Q. On this day who else wasn't wearing their gloves?

A. The person next to me was only wearing one glove.

Q. Who's that?

A. Don [Kearns].

Q. Did Robert Crabb tell him to put on his glove?

A. Yeah, very nicely.

Q. Did Don comply?

A. Yes.

Q. Who else wasn't wearing gloves?

A. Derek Spada.

Q. Did Robert Crabb tell Derek Spada to put on his gloves?

A. Yes.

Q. Did Derek comply?

A. Yes.

*Id.* at 427-28. Based on Hubbell's testimony, the court concluded that a genuine issue of material fact existed as to whether Hubbell had been treated more harshly than her male co-workers. *Id.* at 428. In a footnote, the court made the following observations:

> The court notes that Hubbell described only one encounter with Crabb, whereas Crabb described two separate encounters with Hubbell. Hubbell's testimony contradicts that of Crabb in that Hubbell did not acknowledge that Crabb had returned to tell her a second time that she needed to wear two gloves while working.

*Id.* at 428 n.11. The court further noted that under the Supreme Court's decision in *Scott v. Harris*, 550 U.S. 372 (2007), the parties could have submitted the surveillance tape depicting the incident in question as evidence for consideration at the summary judgment stage. *Hubbell*, 688 F.Supp.2d at 428. Since the parties had not done so, the court was left only with a factual dispute concerning whether Hubbell had been suspended for engaging in the *same* conduct for which a male colleague had *not* been suspended. *Id.* at 428-29. World Kitchen's motion for summary judgment was denied for that reason. *Id.* The Union's motion for summary judgment was denied on the ground that Hubbell's testimony, if believed, could enable a trier of fact to conclude that Watt had knowingly acquiesced in sex-based discrimination by abandoning the grievance procedure after viewing the tape. *Id.* at 434-35.

World Kitchen and the Union have now presented the surveillance tape as evidence supporting their motions for reconsideration.

In a declaration dated July 12, 2010, Good stated that he had located the surveillance tape on April 5, 2010. (ECF No. 122-3 at 3; Good Dec. ¶ 6). At a deposition conducted on September 1, 2010, Good testified that he had been unable to locate the surveillance tape during the early part of 2008. (ECF No. 120-2 at 3; Good Dep. at 7). He explained that he found it in March 2010, after searching the contents of a box containing information related to Hubbell's

suspension. (ECF No. 120-2 at 6-7; Good Dep. at 18-24). Although there was a minor inconsistency concerning the exact date on which Good found the tape, he consistently maintained that he had located it during the spring of 2010. On July 9, 2010, Watt signed a declaration stating that he had viewed the tape again, and that it was the same tape that he had viewed in August 2006. (ECF No. 122-4 at 4; Watt Dec. ¶ 7).

Describing his reasons for abandoning the grievance procedure in his declaration, Watt made the following statements concerning what he had seen on the tape:

> The time frame of the recording that I found to be most relevant starts around 3:52, when Hubbell is shown to be working on one side of the line and another employee, Don [Kearns], is working on the other side. Consistent with my understanding of the facts, neither of them is wearing gloves on each hand at that time. Instead, [Kearns] and Hubbell are only wearing a glove on the hand that is closest to the belt. At about 3:53, Crabb approaches the employees and talks to them. The recording shows that [Kearns] immediately puts on a second glove and worked with two gloves on from that point forward. The recording confirms that, in contrast to [Kearns], Hubbell did not put on a second glove. The recording shows Crabb returning to that area at about 3:59:46, when he appears to speak to Hubbell, who is still wearing only one glove while working on the line. The recording shows Hubbell rising out of her chair, facing Crabb, and speaking to him. This appears to be consistent with her statement that she told Crabb that she intended to leave the work area to get another glove. The recording shows that after Hubbell and Crabb speak to one another, Hubbell sits back down at her work station. At about 4:00, Crabb returns and walks up behind Hubbell, who then appears to put on a glove and then wears a second glove from that point forward.

(ECF No. 122-4 at 4-5; Watt Dec. ¶ 8).

**IV. Discussion**

Title VII declares it to be an "unlawful employment practice" for a covered employer "to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ." 42 U.S.C. § 2000e-2(a)(1). Title VII also contains a provision declaring it to be an "unlawful employment practice" for a "labor organization" "to discriminate against[] any

11

individual because of his [or her] race, color, religion, sex, or national origin . . . ." 42 U.S.C. § 2000e-2(c)(1). The PHRA contains similar prohibitions. 43 PA. CON . STAT. ANN. §§ 955(a), (c). Hubbell contends that World Kitchen suspended her, and that the Union failed to assist her, *because of her sex.*

In order to defeat World Kitchen's motion for summary judgment, Hubbell needed to either discredit World Kitchen's proffered reasons for the suspension or affirmatively demonstrate that the suspension was most likely attributable to sex-based discrimination. *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). Since the ultimate question is whether World Kitchen engaged in unlawful discrimination, the trier of fact would need to *believe* that the suspension was imposed because of Hubbell's sex (and not simply *disbelieve* World Kitchen's explanation for the suspension) in order to find in Hubbell's favor. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 519 (1993). Evidence that an employer's proffered explanation for an adverse employment action is false can constitute circumstantial evidence of discrimination. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003). Such circumstantial evidence, when combined with a plaintiff's prima facie case, may sufficiently undermine an employer's credibility to permit a trier of fact to find that unlawful discrimination was the *real reason* for the challenged employment action. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147-48 (2000).

### A. Authentication of Tape

Hubbell argues that the tape was not properly authenticated within the meaning of Federal Rule of Evidence 901. (ECF No. 119 at 5). Rule 901(a) provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."

FED. R. EVID. 901(a). A piece of evidence can be properly authenticated by means of testimonial evidence. FED. R. EVID. 901(b)(1).

The crux of Hubbell's argument concerning the admissibility of the tape is that the two-year period in which the tape was missing renders it inadmissible.[3] (ECF No. 119 at 5). This argument is without merit. The United States Court of Appeals for the Third Circuit has "long rejected the proposition that evidence may only be admitted if a 'complete and exclusive' chain of custody is established." *United States v. Rawlins*, 606 F.3d 73, 82 (3d Cir. 2010) (quoting *United States v. DeLarosa*, 450 F.2d 1057, 1068 (3d Cir. 1971). In order to establish a chain of custody sufficient to justify the admission of evidence, the party presenting such evidence need only demonstrate a "rational basis" from which it can be determined that the evidence is what it is alleged to be. *Id.* This minimal burden is easily satisfied by the attestations provided by Good and Watt. Therefore, Rule 901 does not preclude the consideration of the contents of the tape as substantive evidence in this case.

### B. Entitlement to Summary Judgment

Watt's description of the events depicted on the tape is consistent with that contained in Good's declaration of July 12, 2010. (ECF No. 122-3 at 3-4; Good Dec. ¶ 8). Moreover, the court viewed the tape and confirmed -- with the exception of the verbal interchange between Crabb and Hubbell -- the accuracy of the statements provided by Watt and Good.

---

[3] Although Hubbell contends that the surveillance tape cannot be authenticated (and that it is "impossible" to ensure that the events depicted thereon "are original, unaltered, true and correct representations of the incident in question"), she does not specifically argue that the tape was, in fact, altered or edited to support the version of the facts posited by World Kitchen and the Union. (ECF No. 119 at 4). The court provided Hubbell with the opportunity to engage in limited discovery for the purpose, *inter alia*, of challenging the reliability of the tape. Hubbell, however, provided no evidence that the tape was improperly altered. Consequently, there is no evidence to discredit the accuracy of the tape concerning the events of June 1, 2006. *Scott v. Harris*, 550 U.S. 372, 378 (2007)("There are no allegations or indications that this videotape was doctored or altered in any way, nor any contention that what it depicts differs from what actually happened.").

The reasoning employed by the Supreme Court in *Scott* inevitably leads to the conclusion that World Kitchen and the Union are entitled to summary judgment. In partially denying World Kitchen's earlier motion for summary judgment, the court specifically relied on Crabb's deposition testimony concerning his *second* encounter with Hubbell had been directly contradicted by Hubbell's own deposition testimony. *Hubbell*, 688 F.Supp.2d at 428 n.11. Having viewed the surveillance tape of the events in question, the court is now convinced that the following language from *Scott* is squarely applicable to the instant case:

> When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

*Scott*, 550 U.S. at 380. Where testimonial evidence describing a sequence of events is directly contradicted by a visual depiction of the events in question, it constitutes nothing more than "visible fiction." *Id.* at 381. In this situation, it is appropriate for the court to view the facts in the light depicted on the surveillance tape. *Id.*

### 1. World Kitchen

It should be noted, of course, that Hubbell may have subjectively believed, at the time of her deposition, that she had been suspended because of her sex. Nonetheless, the issue in this case is whether World Kitchen actually discriminated against Hubbell, not whether Hubbell subjectively believed that World Kitchen had done so at the time of her deposition. *Hubbell*, 688 F.Supp.2d at 419-23. Since the evidentiary record (which now includes the surveillance tape) flatly contradicts Hubbell's testimony describing a single encounter between Crabb and herself on the morning of June 1, 2006, the court is no longer required to accept Hubbell's testimony as true. *Scott*, 550 U.S. at 380-81.

The court acknowledges that the surveillance tape submitted by World Kitchen (and viewed by the court) is inaudible. (ECF No. 111 at 2-3). Because the tape contains only visual depictions, it is impossible to determine precisely what was said by Crabb, Hubbell and Kearns. What is clear from the tape, however, is that Crabb had to confront Hubbell a second time about her failure to wear two gloves, while he only had to confront Kearns about that issue once. This depiction is consistent with Crabb's testimony and inconsistent with Hubbell's testimony. *Hubbell*, 688 F.Supp.2d at 425-28. Since Hubbell's testimony is flatly contradicted by the surveillance tape, she cannot rely on her testimony to discredit World Kitchen's legitimate, nondiscriminatory reason for the suspension.[4] Given that Kearns immediately put on the second glove and Hubbell failed to do so, no reasonable jury could find Hubbell and Kearns were similarly situated at the time of the suspension. No reasonable trier of fact could conclude that Hubbell was suspended *because of her sex*. Summary judgment must be granted in favor of World Kitchen on this claim.

2. **Union**

In denying the Union's earlier motion for summary judgment, the court proceeded on the assumption that the surveillance tape would vindicate Hubbell's testimony, thereby eliminating Watt's asserted justification for abandoning the grievance procedure. *Hubbell*, 688 F.Supp.2d at 435 ("At her deposition, however, Hubbell appeared to be confident that the tape would vindicate her contention that she was *not* insubordinate.")(emphasis in original). In the subsequent opinion denying the Union's first motion for reconsideration, the court explained that Hubbell's prima facie case of discrimination against the Union was itself based primarily on her

---

[4] During the course of her deposition, Hubbell specifically referenced the surveillance tape as if it would vindicate her testimony. *Hubbell v. World Kitchen, LLC,* 688 F.Supp.2d 401, 427 (W.D.Pa. 2010). The dispute concerning what the tape would reveal was a factor weighing against summary judgment when the opinion of February 24, 2010, was filed. *Id.* at 428 ("It is clear that the parties disagree not only about what transpired on June 1, 2006, but also about what the surveillance tape reveals.").

15

testimony concerning what the tape would reveal. *Hubbell*, 2010 U.S. Dist. LEXIS 56584, at *29 ("Because the tape (if Hubbell's version of the incident is believed) would have depicted 'discrimination' (i.e., disparate treatment between Hubbell and Kearns), and since Watt's decision not to continue with the grievance procedure was based on his viewing of the tape, an inference of discriminatory motive could reasonably be drawn at the prima facie stage.")(footnote omitted). Having viewed the tape, however, the court is now convinced that Hubbell no longer has a prima facie case against the Union. *Id.* at **29-31 n.7 ("Where a grievance is *not* based on an underlying claim of discrimination, an inference of discriminatory motive cannot be drawn in the absence of evidence that individuals outside of the plaintiff's class were more favorably treated.")(emphasis in original). Even if Hubbell were able to establish a prima facie case against the Union, she would be unable to refute Watt's legitimate, nondiscriminatory reason for opting not to continue with the grievance procedure. Since World Kitchen is entitled to summary judgment, it follows *a fortiori* that the Union is similarly entitled to summary judgment.

V.   **Conclusion**

A finding of discrimination must "turn on evidence," not merely on a plaintiff's unsupported assertions. *Pryor v. NCAA*, 288 F.3d 548, 566 (3d Cir. 2002); *Hubbell*, 688 F.Supp.2d at 432. The issue in this case is not whether World Kitchen's decision to suspend Hubbell was "wise, shrewd, prudent, or competent," but rather whether it was attributable to Hubbell's sex. *Fuentes*, 32 F.3d at 765. As of February 24, 2010, the court had before it only conflicting testimonial accounts of the events in question. *Hubbell*, 688 F.Supp.2d at 424-29. The surveillance tape of the incident was not available. *Id.* at 428. Now that the tape has been submitted as a part of the evidentiary record, the court need not credit the testimonial evidence

16

that is flatly contradicted by the visual depiction of the incident. *Scott*, 550 U.S. at 380-81. Since Hubbell was the *only* employee who Crabb needed to confront *twice* about her failure to wear two gloves on June 1, 2006, no reasonable trier of fact could conclude that Hubbell was suspended *because of her sex*. For this reason, World Kitchen's motion for summary judgment will be granted. Given that the tape did not depict an instance of "discrimination," it necessarily follows that no inference of sex-based discrimination can be drawn from Watt's decision not to continue with the grievance procedure in connection with Hubbell's suspension. Consequently, the Union's motion for summary judgment will likewise be granted. An appropriate order will be entered.

By the court,

/s/ JOY FLOWERS CONTI
Joy Flowers Conti
United States District Judge

Dated: December 8, 2010